UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

       *Plaintiff*,      :

   - against -       :

               **16 CR 371 (RA)**

JASON GALANIS, et al.,     :

       *Defendant*.    :

-----------------------------------------------------------------X

---

## SENTENCING MEMORANDUM ON BEHALF OF
## JASON GALANIS

---

Christopher Madiou, Esq.
233 Broadway, Suite 2208
New York, NY 10279
(917) 408-6484
*chris@madioulaw.com*

Lisa Scolari, Esq.
20 Vesey St., Suite 400
New York, NY 10007
(212) 227-8899
*lscolarilaw@earthlink.net*

**Introduction**

Jason Galanis will be sentenced by this Court on August 11, 2017. There is a sadly familiar path, well-worn by his father, that has led Mr. Galanis, along with two of his brothers, before the courts of this district. When Mr. Galanis was just a toddler, his father was arrested on fraud charges for the first time. It became a tragic, reoccurring theme in Mr. Galanis' life. And it is even more tragic because he has followed directly in his father's footsteps, facing at least eleven years of incarceration for his crimes. This is not to say that the man before this Court is an irredeemable recidivist. One of the most salient factors, discussed below, is that despite being thrown from his Bel Air mansion into the hellish environs of MCC, he has not succumbed to despair, but instead has newfound clarity about his life and his ability to reform. We ask the Court to focus on that man, and his potential for reform and good deeds, when it considers all the relevant sentencing factors. After such consideration, we believe a below-Guidelines, concurrent sentence is sufficient punishment, but not greater than necessary, for his fraudulent conduct.

**Procedural History**

This is the second time this year that Mr. Galanis will be before a court in this district for sentencing. On July 21, 2016, Mr. Galanis pleaded guilty, pursuant to a plea agreement negotiated by his former retained counsel, to securities fraud and related offenses in 15 CR 643 (PKC) ("Gerova" herein). As a part of his plea agreement in Gerova, he admitted to an aggravating role adjustment, stipulated to a 22-level increase based on loss to investors, agreed to a forfeiture judgement in the amount of $37,951,681.10 and forfeited all interest in his $7 million home in Bel Air, California and his $12 million apartment in Manhattan, among other stipulations. The plea agreement that Mr. Galanis accepted in Gerova reflects a stipulated

Guidelines range of 121 to 151 months, based on an offense level of 31 and a Criminal History Category ("CHC") of II.

However, on July 19, 2016, before he accepted the above-mentioned agreement, a different plea agreement, which covered *both* the conduct in the instant case as well as the offense conduct in Gerova, was extended to Mr. Galanis through his prior retained counsel.[1] The joint-plea agreement provided for a 24-level increase in the base offense level, based on an aggregated loss in Gerova and in the instant case that exceeded $65,000,000 but did not exceed $150,000,000, as well as the other above-mentioned stipulations. The joint-plea agreement had a stipulated Guidelines range of 168 to 210 months, based on an offense level of 34 and a Criminal History Category of II. Regrettably, Mr. Galanis was never counseled as to whether he should accept this plea agreement. His retained lawyers abdicated their constitutional responsibility[2] to advise Mr. Galanis because they were not retained on the instant matter. Mr. Galanis was not advised that, should he plead guilty in the future, his adjusted offense level would be more than double what it was if he pleaded in Gerova only—34 levels higher, to be exact; he was not advised that his base offense level only increased by three points and that it would satisfy an entirely separate case; he was not advised that if he decided to plead guilty to the instant case in the future, his CHC would increase to III. Two days after receiving both agreements, Mr. Galanis pleaded guilty to the Gerova matter only.

On August 12, 2016, undersigned counsels were appointed to represent Mr. Galanis in the instant matter pursuant to the Criminal Justice Act. Shortly thereafter, undersigned counsel

---

[1] The "joint-plea agreement/offer" herein; attached as Ex. A.
[2] *See*, *Boria v. Keane*, 99 F.3d 492 (2d Cir. 1996).

Lisa Scolari sought to retroactively accept the joint-plea offer and allow Mr. Galanis to be

sentenced on both cases by Judge Castel. The government rejected that proposal.

On February 15, 2017, at Mr. Galanis' sentencing hearing before Judge Castel, his prior

retained attorney addressed the first plea agreement and stated that,

> We could not enter into a disposition into that matter because, one, Mr. Galanis at
> the time was pro se; we were not appointed to represent him, nor were we
> retained; I had not seen a single lick of discovery. I had just read a complaint and
> an indictment. I did forward some information -- Mr. Galanis asked me to forward
> early on to Mr. Blais and the prosecution team some documents ... **But I was not
> professionally prepared—nor could I have been—to enter into that joint
> disposition.** So, we chose this disposition with the guideline range of 121 to 151
> months.[3]

At the sentencing, the government argued that Mr. Galanis was a recidivist and specifically

argued that point citing the instant offense conduct:

> We are not looking at Mr. Galanis's crimes here in Gerova in isolation. He's a
> recidivist. He's admitted that he's a recidivist. He's engaged in multiple frauds, not
> just the Gerova fraud and the Tagliaferri fraud, but now a new fraud, a $60
> million fraud involving a Native American tribal entity that issued $60 million of
> bonds that were placed in the accounts of unsuspecting investment advisory
> clients, including pension funds.[4]

Judge Castel then sentenced Mr. Galanis to 135 months of incarceration, elevating his CHC from

II to III because, at the time of sentencing, he had already pleaded guilty to the instant matter.

On January 19, 2017, Mr. Galanis appeared before Your Honor and entered pleas of

guilty to the following Counts of the above-captioned indictment: Count 1, in violation of 18

U.S.C. § 371 (conspiracy to commit securities fraud); Count 2, in violation of 15 U.S.C. §§

78j(b) and 78ff, 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2 (securities fraud); and Count 3, in

---

[3] *Sentencing transcript of Jason Galanis Feb. 15, 2017*, *U.S. v. Galanis*, 15 CR 643 (PKC)
("*Galanis Sent. Tr.*" herein) pp. 11-12 (emphasis added).
[4] *Id*. at p. 40.

violation of 18 U.S.C. § 371 (conspiracy to commit investment advisor fraud).[5] As a part of his plea agreement, Mr. Galanis stipulated to a loss amount that exceeded $25,000,000 but did not exceed $65,000,000,[6] admitted to obstructing justice[7] and accepted a four-level leadership role adjustment pursuant to U.S.S.G. §3B1.1(a).[8]

The Pre-Sentence Report ("PSR")[9] follows the parties' Guidelines stipulation and concludes that Mr. Galanis' adjusted offense level is 34. In CHC III, Mr. Galanis faces an advisory Guideline range of 188 to 235 months, and recommends a concurrent sentence.

As discussed below, we believe a below-Guidelines, concurrent sentence would be sufficient but not greater than necessary to achieve the goals of 18 U.S.C. §3553(a) considering (1) Mr. Galanis' unique personal history and characteristics; (2) his complete transformation after 15-months of incarceration at the MCC; (3) the eleven-year sentence already imposed on Mr. Galanis in Gerova; and (4) the specific facts of the instant offense, which show that Mr. Galanis' actions, while unquestionably fraudulent, never intended to inflict loss on anyone.

Mr. Galanis has admitted to Your Honor and to Probation that his crimes were brazen, misguided and utterly inexcusable. He already faces eleven years in custody, alone, separated from his wife, aging mother, friends and loved ones. When he is finally released he will be in his sixties, broke, saddled with tens of millions of dollars in forfeiture judgements and civil fines, and unable to work in his chosen profession. Mr. Galanis has made clear that he accepts full responsibility for his crimes and stands ready to be punished.

---

[5] PSR ¶ 7.
[6] PSR ¶ 7 A. 4.
[7] PSR ¶ 7 A. 7.
[8] PSR ¶ 7 A. 6.
[9] We have reviewed the PSR with Mr. Galanis, any objections we may have do not affect its Guidelines calculation.

5

I. **Background**

a. The Offense Conduct

Mr. Galanis has pleaded guilty and accepts full responsibility for being one of the leaders

of the instant conspiracy. In that capacity, Mr. Galanis admits to engaging in fraudulent business

practices, including making false and misleading representations to tribal entities, failing to

invest bond proceeds in the specific manner agreed upon in the operative contracts, and

misappropriating funds in order to compensate himself and others prematurely and in a manner

not agreed upon. He also admits to exercising undisclosed influence over the Hughes/Atlantic

registered investment advisor entities ("AAM"),[10] which were run by Michelle Morton, and was

aware that material facts and conflicts of interest were not disclosed to investors by AAM.

b. Mr. Galanis' Personal History and Characteristics

The toxic influence of Jason's father, John Galanis, cannot be overstated. As John's

eldest, Jason's life has been dominated by the man who has been called "one of the 10 biggest

white-collar criminals in America."[11] The Galanis family name has been etched into more than

forty-five years of state and federal criminal indictments, beginning in the early 1970s. Before

Jason was born in 1970, John made millions in illegal stock fraud schemes.

> [John Galanis] lured the rich and famous into his schemes. Before he was tossed
> into prison for the first time, in 1973, he'd convinced the former head of the New
> York Stock Exchange and the past president of RCA to invest in his hedge fund.
> He used their money to buy shares that he was unloading in small companies he
> had hyped. He drove the stock of one company, Hair Extension Center, from $1
> to $10, then sold out for a $750,000 profit before it crashed.[12]

---

[10] AAM was an institutional Registered Investment Advisor with 80 clients and $11 billion in assets.

[11] *See*, *John Galanis, Accused of Giant Fraud, Still Defiant*, Los Angeles Times – September 20, 1987, available at http://articles.latimes.com/1987-09-20/business/fi-9084_1_john-galanis (last visited on July 26, 2017).

[12] *See*, *The Long Reach of John Peter Galanis,* Forbes – September 18, 2000, available at https://www.forbes.com/forbes/2000/0918/6608186a.html (last visited on July 26, 2017).

Throughout Jason's childhood, John's wild extravagance, frequent absences, and periodic arrests contributed to a chaotic home life. John's unpredictable moods vacillated from lavishing expensive gifts on his children to exploding into furious rages. As a shy, unsure kid, Jason needed his father's love and attention far more that the embarrassing largess John flaunted. Jason felt rejected by his father. He believed, as children do, that his father's inattention reflected a lack of care and concern for him. Jason's mother, Chandra, reports that when John was home, he was a "forceful, intimidating" presence and that Jason was constantly trying to "live up to his father's expectations." John believed that he was "always right" and would "stop at nothing" to get his way. Jason's mother was a housewife, who did not work, and provided little counterbalance to Jason's powerful father. She attended to the children's education but failed to show them any real feelings or make any emotional connection. Jason's childhood feelings of abandonment and rejection set the stage for a lifetime of insecurity and striving to meet his father's approval.

The children from the Galanis' conservative, wealthy Connecticut town enjoyed Jason's lavish birthday celebrations—they included professional circus performers and even elephants. However, even at an early age, Jason sensed his friends' parents' disdain. It was humiliating. They looked askance at the ostentatious Galanis home, the elephants, and the stone castle that John had built, by professional masons, for his children to play in.[13] Jason often felt that he didn't fit in. Despite attending private school with children from wealthy families, Jason "felt

---

[13] *See*, *The Long Reach of John Peter Galanis,* Forbes – September 18, 2000, available at https://www.forbes.com/forbes/2000/0918/6608186a.html (last visited on July 26, 2017).

like an outsider," because of John's grandiose behavior. He had trouble making and maintaining friendships and Chandra recalls Jason as a socially isolated child.

But John did not seem to notice. The son of working-class Greek diner owners, John never stopped trying to prove that he had arrived. He wasn't pleased with his origins so he invented better ones—his family owned restaurants and hotels, he faked a Boston Brahmin accent, and claimed to have a law degree from Harvard. Jason was immersed in a lifestyle that trumpeted wealth and its trappings. The family lived in a multimillion dollar mansion with a tennis court, an indoor swimming pool, and a lake; they had a Park City Utah ranch house; a Rolls Royce; an 80-foot yacht; and even a Lear Jet. When Jason was sixteen, John bought him a hundred-thousand-dollar Ferrari. But it was never enough for Jason's father. The Galanis children were taught, implicitly, that these *things* were the measure of a man's worth. And despite John's garishness and distance, Jason still idolized his father.

In 1985, John moved his family to California because things hadn't been going well for him on the East Coast. He bought two additional luxury homes and moved his family into an 18,000 square-foot Del Mar mansion, which last sold for $50 million.

When Jason was thirteen, his father was indicted by the New York County District Attorney's for defrauding Chase Bank out of millions of dollars. A few years later federal agents raided his father's Greenwich office, collecting evidence of yet another fraud. In 1986, the house of cards collapsed. John was indicted and arrested for additional fraud schemes in both the Southern District and New York County. The fifty-eight count N.Y. County indictment claimed he had cheated investors out of more than $75 million and the thirty-eight count S.D.N.Y. RICO indictment alleged losses of more than $100 million.

In the months after John's arrest, tremendous pressure was put on Jason to be "the man of the house"—he was sixteen at the time. Chandra expected Jason to act like the head of the family, deal with his father's lawyers, help run the household and act as father figure to his siblings.  Despite facing a multitude of charges, being in jail for months before making bail, and facing an avalanche of bad press, John maintained a facade of innocence.

John misled his family as he had his victims.  Although he was forced to deal with the fallout of his father's arrests, Jason believed "for years" that his father was the undeserving target of overzealous prosecutors. Chandra shared and enabled that belief. She raised Jason to revere his father, fostering the idea that he was a brilliant, creative, and a justifiably successful businessman, rather than a scam artist of massive proportions.

Jason was barely eighteen his when his father was sentenced to twenty-seven years in federal prison. In his hubris, John had failed to make any plans for his family; they were financially and emotionally decimated. All of the properties were seized; there was no income; they lost the roof over their head, and any sense of security. At the time, Jason had little interest in business and had just started college, intent on majoring in history. College should be the time when a young adult forges his own identity, an opportunity to find one's moral compass.

But Jason was never permitted to pursue his own path and he remained firmly under his father's influence. As the eldest, Jason was required to be his family's provider; it was made clear that he "owed them."  While in his first year of college in California, Jason lived in Arizona for weeks at time, making daily pilgrimages to visit John in prison. During those visits, he was manipulated and pressured to enter the world of business, John Galanis style.

More than ever, Jason was under tremendous pressure to live up to his father's unrealistic expectations.  At John's direction, Jason started a finance company that bought bad credit card

debt to support his family. Since Jason's life revolved around his family obligations, he transferred from U.S.C. Santa Barbara to U.S.C. San Diego to be closer to his siblings and the California prison where John had been transferred. Throughout college, Jason remained heavily enmeshed with John, continually visiting him in prison. Ultimately, Jason fully committed to the business world and left college without graduating. However, despite abandoning his own goals, Jason supported his parents and put his brothers through private schools and college.

In 1997, Jason met Monet Berger, whom he married in 2006. Monet describes the evolution of their relationship as "slow" as Jason was "very shy" and had a "fear of rejection." They had a "great relationship" until John Galanis intruded into Jason's life once again. In 2001, John absconded from a work release program and agents stormed Jason and Monet's home with guns drawn, looking for him. Not long after that, Jason was arrested and charged with his brother Derek, John, and twenty others in an ecstasy distribution ring. When it became clear that Derek had used Jason's name, the charges were dismissed, but Jason and Monet remained unsettled.

Between 2000 and 2010, Jason continued to build multiple investment and finance companies, but often had difficulty finding investors or parties willing to work with him because of the publicity connected to his father's criminal conduct. He began experiencing negative press, first as the son of John Galanis and then in his own right. Jason struggled with insecurity and poor self-esteem, which he hid with an understated version of his father's bravado. Striving to live up to his father's outrageous level of financial success, Jason took more risks, walking close to, and several times crossing, ethical and legal lines. He emulated his father, accumulating the showy symbols of wealth. He lived a lavish lifestyle, with expensive homes in Bel Air and New York City, "his and hers" Bentleys, traveling the world and dining at the finest restaurants.

At the request of counsel, The Consulting Project, forensic mitigation specialists, gathered information and prepared an evaluation of Jason for the Court. Their conclusion that Jason "developed a maladaptive set of coping skills in response to enduring years of lifestyle instability, leading to the lack of successful identity formation and social and emotional development as an adult" is contained in the attached report.[14]

Jason's unique background is proffered because, under 18 U.S.C. §3553(a)(1), this Court must consider Jason's "history" as well as his "characteristics." Jason, to his credit, does not blame his father, or his upbringing, for his criminal conduct and the above history is not an attempt to offload responsibility for his crimes. He is now forty-seven and rightly recognizes that he alone is responsible for his conduct. Jason has accepted full responsibility by pleading guilty, twice in this District, and has written a genuinely remorseful letter to the Court.[15] He writes, "I'm a man with broad shoulders, as I was required to take on responsibility from an early age, but these shoulders now need to carry a lifetime of shame."

Jason is consistently described in the letters written by his family and friends as kind, sensitive, loyal, and generous.[16] Starting in 2012, Jason began to volunteer at Operation Gratitude, in California. The program is a non-profit organization that sends care packages to deployed troops, their children at home, veterans, and their care givers. Monet reports that Jason was able to "explore the good part" of himself while working at Operation Gratitude. Jason's involvement in the program brought him enormous satisfaction and a fulfillment he never had in the world of finance—he was doing work that genuinely helped others, without being paid. The

---

[14] Attached as Ex. B.
[15] Attached as Ex. C.
[16] The letters are attached as Ex. D.

letters written by people Jason worked with at Operation Gratitude reflect the enthusiasm and joy with which he participated in the program and show an evolution in Jason's thinking.[17]

Jason has had a dramatic transformation while detained in the MCC for the last 15 months. When undersigned counsels first met him, he had been incarcerated for three months, was facing two indictments, and struggling to stay emotionally stable. He was bravely coping with the near-daily terror of prison violence and was dreading the prospect of many more years in such a place. It would have been easy for him to succumb to hopelessness.

But instead of staying in his cell, away from the ever-present pandemonium of prison life, Jason chose to engage. He chose to find something of value in the maelstrom of rage, frustration, and fear that surrounds him. He chose to make a contribution. He chose to find meaning in something that has no monetary value. Jason chose to teach his fellow inmates under the supervision of BOP's education department. Teaching much younger, poorly educated, gang members from the Bronx has been an incredible challenge, but Jason has done exceptionally well. His case manager writes that "[Jason] has played a significant role in encouraging his peers, and uses his time to help others achieve short- term goals academically."[18] The letters written by Jason's students, about their teacher, are even more powerful: "It is not Mr. Galanis's teaching style, but the earnestness and personal transparency he displayed that the young men responded too. You can't fool kids from the street with fancy words and being fake. Jason poured himself out to these kids, doing everything right and possibly not even knowing it."[19]

Jason has evolved into a person who values human connections over financial success and material possessions, which is a qualitatively different life than the one he has led. We ask

---

[17] Attached as Ex. E.
[18] Attached as Ex. F.
[19] Letters from four of Jason's students at MCC are attached as Ex. G.

the Court to consider this tectonic shift in Mr. Galanis, as well as the factors discussed below, when it imposes sentence for the instant offense.

## II.   **Argument**

The Guidelines attempt to restore justice after criminality and "further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation."[20] But there are inherent limitations to its formulaic approach, as the Sentencing Commission admits: "The appropriate relationships among [sentencing] factors are exceedingly difficult to establish, for they are often context specific. […] Thus, it would not be proper to assign points for each kind of harm and simply add them up, irrespective of context[.]"[21] Reducing the enormous task of sentencing another human to calculating loss under U.S.S.G. § 2B1.1 is a mistake. "Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."[22] Mr. Galanis' Guidelines calculation, while stipulated to and correct, simply cannot account for his unique background and the circumstances surrounding his offense.

However, 18 U.S.C. §3553(a) requires the Court to consider not only the nature and circumstances of the offense, and the appropriate Guidelines range, but also the unique history and characteristics of each person. We respectfully submit that when the Court considers the totality of Mr. Galanis' life and circumstances, a below-Guidelines, concurrent sentence, pursuant to U.S.S.G. §5G1.3(d), is sufficient, but not greater than necessary to achieve the statutory sentencing goals.

---

[20] U.S.S.G. Ch. 1 Pt. A (2).
[21] U.S.S.G. Ch. 1 Pt. A (3).
[22] Sentencing Memorandum and Order at 2, *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. Oct. 24, 2012)(11 Cr. 907 (JSR)), Dkt. 127 ("*Gupta* Order" herein).

     a.  <u>A Guidelines Sentence is Greater than Necessary to Achieve the Goals of</u>

        <u>18 U.S.C. §3553(a)</u>

The Court is not writing on a blank slate when it sentences Mr. Galanis—he is currently

serving a 135-month sentence imposed in 15 CR 643 (PKC). On top of that sentence, his

advisory Guidelines for the instant offense call for an additional 188 to 235 months of

incarceration. The Supreme Court has directed district courts to "begin all sentencing

proceedings by correctly calculating the applicable Guidelines range"—that "should be the

starting point and the initial benchmark."[23] Mr. Galanis' stipulated, advisory Guidelines range,

however, is not an appropriate starting point or benchmark.

        i.  The Joint-Plea Offer is an Appropriate Starting Point.

As stated above, Mr. Galanis was effectively unrepresented when a joint-plea offer was

conveyed to him on July 19, 2016 and was entirely unadvised of the consequences of rejecting

that offer. Prior retained counsel failed to counsel Mr. Galanis about the advisability of accepting

the joint-plea offer despite affirming, on the record, that he "had just read [the detailed, 45-page]

complaint and an indictment [in the instant matter]."[24] Mr. Galanis was deprived of effective

assistance of counsel because he was unadvised regarding the joint-plea offer and instead

advised to only plead guilty in Gerova, while the instant matter was still pending.

Since 1996, the law of this Circuit has been clear: counsel is *constitutionally required* to

discuss with their clients the advisability of accepting an offered plea bargain, and failure to do

so is a violation of a defendant's right to effective assistance.[25] Mr. Galanis was not advised that

---

[23] *Gall v. United States*, 55 U.S. 38, 49 (2007).

[24] *Galanis Sent. Tr.* p. 11.

[25] *Boria v. Keane*, 99 F.3d 492 (2d Cir. 1996). It is also relevant that Mr. Galanis' prior retained attorneys were not admitted to the bar of this district but were instead admitted to represent him in 15 CR 643 (PKC) *pro hac vice*.

his future adjusted offense level would be 34-offense levels higher than the joint-plea offer; he was unaware that his CHC would jump from II to III; he was oblivious to the fact that the sole and joint-plea offers were separated by a mere three offense levels.

Mr. Galanis pleaded guilty two days after receiving both the sole and joint-plea offer. Prior retained counsel stated, on the record, that Mr. Galanis was "pro-se" and treated the plea offer to Gerova as a stand-alone event, utterly ignoring their constitutional responsibility to advise Mr. Galanis and effectively represent him during plea negotiations. Ignoring the impact of the joint-plea offer, because they were not retained, was ineffective—the Gerova plea was not offered in a vacuum and the consequences were clear. Retained counsel may not have been required to personally represent Mr. Galanis on the instant matter. However, counsel had an obligation to advise Mr. Galanis and protect his rights by, for example, promptly informing the Court and the government that they were not attorneys of record in the instant matter; informing the Court that there was a joint-plea offer pending which required immediate consideration; and requesting that CJA counsel be appointed to advise Mr. Galanis of the impact of rejecting the joint-plea offer. They did not do so and took no steps to protect Mr. Galanis from obvious Guidelines harm. Instead, they advised Mr. Galanis to plead *only* to the case they were retained on, Gerova, which he did a mere two days after receiving both offers from the government.

Soon after undersigned counsels were appointed to represent Mr. Galanis', we promptly contacted the government to inform them of Mr. Galanis' intention to plead guilty to the instant charges and requested that the joint-plea be re-offered to him. That request was denied.

The above facts are proffered to show that the Guidelines range in the government's joint-plea offer is a reasonable starting point. It was an offer the government made after they had drafted a 45-page complaint in the instant matter; a time when all offense conduct was known,

the investigation had concluded and Mr. Galanis was incarcerated at the MCC. It shows that a base offense level 34 with an advisory Guidelines range, in CHC II, of 168 to 210 months incarceration was a reasonable starting point for both matters. Nothing has changed since July 19, 2016 *except* that Mr. Galanis is now represented.

Mr. Galanis' stipulated offense level of 34 and CHC of III in the instant matter is technically correct, but we submit that given the uniquely-bizarre underlying circumstances outlined above, a more appropriate "starting point" is 168 to 210 months of incarceration. If Mr. Galanis would have been properly advised, he would have immediately accepted the government's joint-plea offer.

ii.   The Advisory Guidelines Range is Not Based on Empirical Research.

While we believe that 168 to 210 months of incarceration is an appropriate starting point, this Court may not presume that the appropriate sentence necessarily lies within the Guidelines range.[26] The Guidelines' relevance stems, in part, from an assumption that they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."[27] However, the driving force behind Mr. Galanis' Guidelines range, §2B1.1's loss table, is not based on "careful study" and "extensive empirical evidence."

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing,"[28] and to use average sentences imposed, and prison time actually served, in the pre-Guidelines period as a "starting point."[29] The Commission was to continually review and revise the Guidelines in light

---

[26] *See*, *Gall*, 552 U.S. at 50 n.6.
[27] *See*, *id*. at 46; *Rita v. United States*, 551 U.S. 338, 349 (2007)
[28] 28 U.S.C. § 991(b)(1)(A).
[29] 28 U.S.C. § 994(m).

of sentencing data, criminological research, and consultation with frontline participants in the criminal justice system.[30] The original Commissioners abandoned the effort to design the Guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly developed the Guidelines based on an empirical study of the time served for various offenses before the Guidelines.[31]

When a Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" a sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."[32]

The §2B1.1 fraud Guideline is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation.[33]

In his sentencing order in *Gupta, supra,* Judge Rakoff explains that the "huge increase" in sentences for securities fraud cases is a "deviation of the Guidelines from the original goals of the Sentencing Commission[.]"[34] The advisory Guidelines for securities fraud cases "are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an even more draconian approach to white collar crime, *unsupported by any*

---

[30] *See*, 28 U.S.C. §991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).
[31] *See*, U.S.S.G., Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).
[32] *Kimbrough v. United States*, 552 U.S. 109-10 (2007).
[33] *See, Pepper v. United States*, 562 U.S. 476 (2011); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.
[34] *See, Gupta* Order at 3-4.

*empirical data*."[35] Judge Rakoff notes that the increase in white collar sentencing was a Congressional reaction to the massive Enron and Worldcom frauds, but warns that by "making a Guidelines sentence turn, for all practical purposes, on this single factor [i.e., loss amount], the Sentencing Commission effectively ignored the statutory requirement" to consider the factors listed in 18 U.S.C. §3553(a), and "effectively guaranteed that many such sentences would be irrational on their face."[36]

Many courts throughout the country have recognized that the §2B1.1 fraud Guideline is not based on careful study and empirical research and have consistently varied downward.

iii.   Empirical Sentencing Data Supports a Below-Guidelines Sentence.

In preparation for sentencing, counsel retained MCM Data Consulting to conduct a statistical analysis of cases similar to Mr. Galanis'. The purpose of this analysis is to further the original goal of the Guidelines and engage in the "careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."[37] MCM has done just that. MCM conducted two analyses on behalf of Mr. Galanis: one was predicated on the joint-plea offer—an offense level of 34 and a CHC of II—and the other on the instant plea agreement—an offense level of 34 and a CHC of III.[38]

The analysis examined data published by the United States Sentencing Commission from fiscal years 1999 through 2016, but did not include cases for which a defendant received a downward departure for substantial assistance pursuant to U.S.S.G. § 5K1.1. The data from fiscal year 2016 is the most recent data available from the Sentencing Commission. "United

---

[35] *Id*. at 4 (emphasis added).
[36] *Id*. at 4-5.
[37] *See*, *Rita v. United States*, 551 U.S. 338, 349 (2007)
[38] MCM's entire analysis, including the methodology used in conducting its analysis, is attached hereto. Ex. H is the analysis of the joint-plea offer; Ex. I is the accepted plea offer.

18

States Federal Courts handled over 1.3 million criminal cases between the fiscal years 1999 and 2015. The USSC estimates that 99% of all cases are included in this dataset."[39]

The analysis conducted by MCM examines defendants similar to Mr. Galanis who were sentenced under the fraud guidelines found in U.S.S.C. § 2B1.1. As shown in Table A of Ex. H, there were 7 defendants in Mr. Galanis' §2B1.1 loss category of 24 (i.e., the aggregated loss in the joint-plea agreement) and in CHC II. All 7 defendants were sentenced to a term of imprisonment.[40] Nationwide, for those 7 defendants whose loss amounts were in the same range as Mr. Galanis, the average sentence was 113 months.[41] 5 of those defendants (71.4%) received a below guidelines sentence and 2 (28.6%) received a sentence within the Guidelines range.[42]

As shown in Table A of Ex. I, there were 8 defendants in Mr. Galanis' §2B1.1 loss category of 22 (i.e., the loss in the accepted plea agreement) and in CHC III. All 8 defendants were sentenced to a term of imprisonment.[43] Nationwide, for those 8 defendants whose loss amounts were in the same range as Mr. Galanis, the average sentence was 144.9 months.[44] 5 of those defendants (62.5%) received a below guidelines sentence and 3 (37.5%) received a sentence within the Guidelines range.[45]

Nationwide, there were 7 defendants sentenced in Mr. Galanis' loss category of 24 (i.e., the aggregated loss in the joint-plea agreement) and in CHC II.[46] 2 defendants were sentenced in the Southern District of New York. Both defendants had a total offense level of 37, and were

---

[39] *See*, Exs. H and I, at 2.
[40] Ex. H at 4 Table A.
[41] *Id*.
[42] *Id*. 5 Table B.
[43] Ex. I at 4.
[44] *Id*.
[45] *Id*. at 5 Table B.
[46] Ex. H at 6.

facing a Guidelines range of 235-293 months. Both defendants were sentenced below their

Guidelines range and the average sentence was 130 months of incarceration.[47] There were no

defendants sentenced in the Second Circuit that shared Mr. Galanis' loss category of 22 (i.e., the

loss in the accepted plea agreement) and CHC of III.[48]

b.   <u>Actual vs. Intended Loss</u>

While Mr. Galanis' conduct was unquestionably fraudulent, he did not intend to steal

$43,277,436. The Guidelines instruct courts and prosecutors to calculate the "greater of actual

loss or intended loss" under U.S.S.G. § 2B1.1(b)(1). The Application Notes define "intended

loss" as "the pecuniary harm that the defendant purposely sought to inflict."[49] To be clear, here,

Mr. Galanis has stipulated to an *actual* loss that exceeded $25,000,000 but did not exceed

$65,000,000[50] and the following discussion of intended loss is not proffered to alter his

stratospherically-high, stipulated Guidelines range. The following analysis, however, is still

highly relevant under 18 U.S.C. 3553(a)(1) which instructs this Court to examine "the nature and

circumstances of the offense *and* the history and characteristics of [Mr. Galanis]." Indeed,

nothing could be more significant to this sentencing Court than Mr. Galanis' intent regarding the

charged offenses and, specifically, the bonds at issue.

The Sentencing Commission's November 2015 amendments to the Guidelines now

require courts to determine intended loss by following the method applied in *United States v.*

*Manatau*, 647 F.3d 1048 (10th Cir. 2011).[51] *Manatau* makes clear that "the intended loss must

---

[47] *Id*.

[48] Ex. I at 5.

[49] U.S.S.G. § 2B1.1 n.3(A)(ii).

[50] PSR ¶ 7 A. 4.

[51] *See*, Amendments to the Sentencing Guidelines (effective November 1, 2015), Policy
Statements and Official Commentary at 29.

have been an object of the defendant's purpose."[52] Furthermore, intended loss "does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated."[53] In so holding, *Manatau* affirms the fundamental difference, and significance, between the mental states of *knowledge* and *intent*: it is the "difference between a man who wills that a particular act or result take place [intent] and another who is merely willing that it should take place [knowledge]."[54] Or, relevant here, it is the difference between the intent to *steal* millions of dollars and the knowledge that millions of dollars would be being lost if corrupt and fraudulent business practices are discovered by investigators. Mr. Galanis should have known that if his fraudulent business practices were discovered, there would be a loss—but that does not mean he intended the loss to occur.

Knowledge and anticipation of a potential loss are not the same as *intending* to cause a loss. "The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law."[55] Here, while Mr. Galanis unquestionably committed fraud in connection with the bond issuances—in the form of undisclosed conflicts of interest, misappropriation of bond proceeds, non-arm's length dealing and, at times, outright misrepresentations—his essential plan, while complex and far-flung, never contemplated a loss to anyone.

---

[52] *Id*. at 1048.
[53] *Id*. at 1050.
[54] *Id*. at 1051.
[55] *Id*.

In March of 2014, John Galanis met with representatives of the Wakpamni Lake Community Corporation ("WLCC") at a Native American economic conference in Las Vegas.[56] Less than a month later, the Tribal Bonds were approved by the WLCC board.[57]

From March 2014 through April 2016, Mr. Galanis and others caused the WLCC to issue approximately $60 million worth of debt, via the Tribal bonds at issue.[58] Under his plan, the Wakpamni Tribe ("the Tribe") itself would not be responsible for any payments toward the bonds. His plan provided for an up-front loan to the Tribe of $2.5 million, the payment of an annual $250,000 fee to the Tribe to be used for tribal development, and an agreement that an annuity, investing pursuant to a private equity strategy of Mr. Galanis' design, would be established to pay for the interest, principal and other fees related to the Bonds.[59]

"Proceeds from the sale of the Bonds [were] to be used to finance: (i) the purchase of an Annuity Contract; (ii) the Junction 18 Development, and (iii) pay costs of issuance of the Bonds [i.e., the interest and principal on the loan/Bonds]."[60] In short, Mr. Galanis sought to have the WLCC act as a conduit sponsor[61] for the issuance of debt which was non-recourse to the Tribe

---

[56] Compl. p. 13 ¶ a.

[57] Compl. p. 13 ¶ c.

[58] PSR ¶ 14.

[59] "The Corporation [WLCC] has been able to borrow funds, which it wishes to invest utilizing a private equity strategy that has a historically higher rate of return. In order to reduce the risk that some interim event might result in a disruption of the funds necessary to make payment on the Corporation's borrowing, the Manager is instructed to purchase a variable annuity which will provide for sufficient cash flow to service the debt plus an amount to meet other obligations to the tribe (estimated to be $250,000 per annum). … To secure the best investments, the Manager is to take a flexible approach to sourcing and structuring investments, and be involved in multifaceted transactions …. The Manager whenever possible will give preference to investments in the financial services sector." *Statement of Investment Objectives*, Exhibit A of the *Investment Management Agreement between Private Equity Management Limited and WLCC*, attached hereto as Ex. J.

[60] Legal Opinion Letter, dated August 25, 2014, issued by Greenberg Traurig to its client WLCC ("*GT Legal Opinion Letter*" herein) at 1, attached hereto as Ex. K.

[61] Conduit sponsorships are common in finance. Wisconsin Public Finance Authority has recently agreed to be conduit in the issuance of $800 million in bonds to help complete a mall in New Jersey. *See, New Jersey Prepares an $800m Assist for Mall Developer*, WNYC News –

because of their status as a Sovereign Nation.[62] The contracts were drafted so that the Tribe was shielded from financial liability through WLCC. WLCC is a Special Purpose Entity ("SPE") created by the Tribe years before the instant offense conduct. An SPE is a subsidiary company commonly used to isolate financial risk. SPEs are commonly used to hide debt, hide ownership, and obscure relationships between different entities which are, in fact, related. Therefore, if the WLCC went bankrupt, the Tribe, as a Sovereign Nation, could not be held liable for the WLCC/SPE's debts—including the bonds at issue.

At its core, Mr. Galanis' crime is his use of deceptive and misleading business practices in the issuance and placement of the bonds; his fraudulent acts were a malignancy at the center of the deal. However, his specific intention was never to inflict loss on anyone. Mr. Galanis was pursuing a private equity strategy focused on acquiring insurance companies which were undervalued when compared to their net assets.

It was Mr. Galanis' intention to pay the fees associated with the bonds with the money he made through his private equity investments. The bonds were central to his strategy because they gave Mr. Galanis the capital necessary to acquire the undervalued insurance companies he and others had identified. The bonds would help finance his private equity strategy and the fees and principal associated with the bonds would be paid as well as the agreed upon annual fees to the Tribe. The private equity investments were the variable annuity that WLCC bought from WAPCC, but the execution was not consistent with the existing contracts—on top of undisclosed

---

August 8, 2016, available at http://www.wnyc.org/story/new-jersey-prepares-800m-assist-mall-developer/ (last visited on July 18, 2017).

[62] "The Bonds have been duly authorized, executed and delivered and constitute the legal, valid and binding **limited obligation of the Issuer [WLCC] payable solely from the Pledged Revenue** [i.e., not from the Tribe itself.]"*GT Legal Opinion Letter* at p. 2 ¶ 3 (emphasis added).

conflicts of interest—and thus, fraudulent. The strategy, but for his fraudulent business practices, would have been sound. The bonds were not per-se illegal—his conduct, however, was.

Mr. Galanis rationalized his fraudulent conduct because he believed that sufficient collateral existed to back the bond issuances. Mr. Galanis' company, Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale"), held approximately $13,419,837.23 in securities in Wealth Assurance Holdings Ltd ("WAH"). In November 2014, WAH acquired Valorlife, a licensed life insurance company in Liechtenstein. Mr. Galanis' WAH securities converted to approximately 1,677,400 shares of Valor Group, Ltd.—representing approximately 40% of the outstanding shares. Valor Group, Ltd. was audited by PricewaterhouseCoopers ("PwC") in 2015; PwC's audit confirmed two independent Embedded Value Appraisals which found Valor Group to be worth $259,552,895.22.[63]

Mr. Galanis' intention was to deliver these Valor securities to WAPCC as collateral for the bond debt. Again, the revenue generated from these investments would fund the annuity that would pay the bond fees and principal. Mr. Galanis justified misappropriating the bond proceeds—including $5 million in personal expenses, $2.5 million to his father as a "finder's fee" and $1.25 million to defense lawyers[64]—because at all times the collateral exceeded the total amount of the bond issuances, and as long as he continued to pay the interest and fees associated with the bonds, everyone, in the end, would make money.

It bears repeating that Mr. Galanis' actions were *not* in accord with the operative contracts. And obviously, nothing about the above conduct commends itself to the Court. Mr.

---

[63] Ex. L is an audited balance sheet of Valor Group, Ltd—prepared by PwC and based on independent Embedded Value Appraisals performed by Ernst & Young Ltd. and Deloitte— which lists the liabilities and stockholders' equity at the time of audit.
[64] Compl. p 44 ¶ 62.

Galanis was incredibly reckless and he committed outright fraud. He has accepted responsibility for that conduct and stands ready to be punished for it. But his conduct is still different, in kind, than a defendant who specifically intends to inflict loss.

### III.   A Reasonable Sentence

The Supreme Court has said that the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[65] The district court must make an "individualized assessment" of the sentencing warranted by §3553(a) "based on facts presented" and "may not presume that the Guidelines range is reasonable."[66] The deference granted to a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as "its familiarity with the individual case and the individual defendant before it."[67]

Here, when considering all relevant factors, a variant, concurrent sentence, is sufficient punishment for Mr. Galanis' criminal conduct, but not greater than necessary. The Court may impose a sentence completely concurrent to the 135-month Gerova sentence, which is an "undischarged term of imprisonment" pursuant to U.S.S.G. §5G1.3(d).[68] Indeed, Probation agrees that Mr. Galanis should serve a sentence "concurrently to the defendant's sentence under 15 CR 643 (PKC)."[69] However, Probation recommends an additional 53 months on top of the 135 already imposed in Gerova. This is greater than what is necessary.

---

[65] *Pepper v. United States*, 562 U.S. 476, 487 (2011)(*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).

[66] *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008).

[67] *Id*. at 170.

[68] Additionally, since the time Mr. Galanis has in custody has already been credited to the Gerova sentence, this Court will have to deduct the time from his remand in May 2016 (approximately 15 months) in order for him to receive jail time credit in this case. *See*, 18 U.S.C. 3585(b).

[69] PSR at p. 32.

Eleven years of incarceration is not a "light" punishment. Judge Rakoff observes that "no one really know how much jail time is necessary to materially deter [securities fraud.]"[70] And in fact "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not."[71] He concludes by rightly asserting that "a relatively modest prison term should be 'sufficient, but not more than necessary,'" to satisfy general deterrence.[72]

Eleven years of incarceration, total financial ruin, tens of millions of dollars in forfeiture, along with the public shame and contempt that Mr. Galanis has brought upon himself is anything but "modest" punishment. Simply put, Mr. Galanis has been sentenced to a term of imprisonment that meets the requirements of §3553(a)—it is sufficient punishment, but not greater than what is necessary. Judge Castel, in considering both the facts of Gerova *and* this case, sentenced Mr. Galanis to 135 months. The government argued that Mr. Galanis was a recidivist and specifically argued for a harsh sentence in Gerova using the instant offense conduct. By sentencing Mr. Galanis to 135 months concurrently with Gerova, this Court can recognize that the government's joint-plea *was* the reasonable starting point; it can recognize the empirical research which shows that a 130-month sentence is the mean for defendants in CHC II with a 24-level §2B1.1 loss enhancement (i.e., Mr. Galanis' range in the joint-plea); it can recognize that the instant CHC and Guidelines ranges overstate the need for a sentence recommended by Probation. Finally, Your Honor now has the opportunity to recognize that the man now before the Court is qualitatively different than he was 15 months ago when he first stepped into the MCC, and it can give that person a chance at a life beyond incarceration.

---

[70] *Gupta order*, at 14.
[71] *Id.*
[72] *Id.*

IV.   <u>**Conclusion**</u>

Mr. Galanis has accepted full responsibility for his offense conduct and stands ready for punishment. His crimes were brazen and driven by greed and personal gain. But he is also a man who is eminently redeemable; a man who can one day live a productive, instructive life, after he emerges from prison. As his family's and friend's letters show, he will have tremendous support and encouragement, to do just that.

In closing, we wish to observe that there is—or there should be—a place in criminal sentencing for Mercy. Mercy for a man already left humiliated, penniless and scorned because of his actions. Mercy for a man who will suffer incarceration alone, away from his wife and loved ones. Mercy for a man who has transformed his life by teaching and mentoring young men from radically different backgrounds, all while living in the most horrific conditions. Mercy is not a word found in the Sentencing Guidelines, and it is likewise not to be found in 18 U.S.C. §3553(a). But, we believe, there is a role for it in connection with sentencing. Yes, punishment promotes respect for the law; and yes, punishment is instructive to others. But we believe that mercy shown to Jason Galanis would also promote respect for the law, and would instruct others that fairness and individualized sentencing determinations are possible.

Respectfully submitted,

_____
Christopher Madiou, Esq.

And

_____
Lisa Scolari, Esq.
*Attorneys for Jason Galanis*

New York, New York
July 28, 2017

# Exhibit A



*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 19, 2016

Thomas Mazzucco, Esq.
Murphy Pearson Bradley & Feeney
88 Kearny Street
San Francisco, CA 94108

### Re: United States v. Jason Galanis, S1 15 Cr. 643 (PKC)

Dear Mr. Mazzucco:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Jason Galanis ("the defendant") to the above-referenced Superseding Information ("the Information"). Count One charges the defendant with conspiracy to commit securities fraud, from at least in or about 2009 through in or about 2011, in violation of Title 18, United States Code, Section 371. Count One carries a maximum sentence of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Two charges the defendant with securities fraud, from at least in or about 2009 through in or about 2011, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. Count Two carries a maximum sentence of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571, of the greatest of $5 million, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Three charges the defendant with investment adviser fraud, from in or about June 2010 through in or about September 2010, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2. Count Three carries a maximum sentence of imprisonment of five years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 15, United States Code, Section 80b-17 and Title 18, United States Code, Section 3571, of the greatest of $10,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

Rev. 06.03.2016

Count Four charges the defendant with conspiracy to commit securities fraud, from at least in or about November 2007 up to and including in or about April 2010, in violation of Title 18, United States Code, Section 371. Count Four carries a maximum sentence of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

Count Five charges the defendant with conspiracy to commit securities fraud, from at least in or about March 2014 through in or about April 2016, in violation of Title 18, United States Code, Section 371. Count Five carries a maximum sentence of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Six charges the defendant with securities fraud, from at least in or about March 2014 through in or about April 2016, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. Count Six carries a maximum sentence of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571, of the greatest of $5 million, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Seven charges the defendant with conspiracy to commit investment advisor fraud, from at least in or about May 2014 through in or about April 2016, in violation of Title 18, United States Code, Section 371. Count Seven carries a maximum sentence of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

The total maximum term of imprisonment on Counts One through Seven is 65 years.

The defendant hereby admits the forfeiture allegations with respect to Counts One through Seven of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, a sum of money equal to $80,869,117.10 in United States currency, representing any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Seven of the Information (the "Money Judgment"); and (ii) all right, title, and interest of the defendant in the following specific property: 1920 Bel Air Road,

Los Angeles, California, 90077 and 260 West Broadway, Unit 1, New York, New York, 10013 (collectively the "Specific Property").  It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees to make restitution in an amount ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1.  The November 1, 2015 version of the Guidelines applies.

2.  Pursuant to U.S.S.G. § 3D1.2(d), Counts One through Seven are grouped together because the offense level is determined largely on the basis of the total amount of loss.

3.  U.S.S.G. § 2B1.1 applies to the offenses charged in Counts One through Seven.  Pursuant to U.S.S.G. §§ 2B1.1(a)(1), 2X1.1(a) and 3D1.3(b), because Counts Two and Six have a statutory maximum term of imprisonment of 20 years, the base offense level is 7.

4.  Because the loss amounts for Counts One through Seven exceeded $65,000,000 but did not exceed $150,000,000, the offense level is increased 24 levels to 31, pursuant to U.S.S.G. § 2B1.1(b)(1)(M).

5.  Because the offenses involved 10 or more victims, the offense level is increased by 2 levels to 33, pursuant to U.S.S.G. § 2B1.1(b)(2)(A).

6.  Because the defendant was an organizer or leader and the criminal activity involved five or more participants or was otherwise extensive, the offense level is increased by 4 levels to 37, pursuant to U.S.S.G. § 3B1.1(a).

7.  Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to

avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 34.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has 3 criminal history points, calculated as follows:

    1. On or about March 30, 2011, the defendant was convicted, in the United States District Court for the Central District of California, of attempted tax evasion, in violation of 26 U.S.C. § 7201, which resulted in a sentence of five years' probation. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point.

    2. Because the defendant committed the instant offense while serving a term of probation, two criminal history points are added pursuant to U.S.S.G. § 4A1.1(d).

In accordance with the above, the defendant's Criminal History Category is II.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 168 to 210 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 34, the applicable fine range is $50,000 to $5,000,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new

information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 168 to 210 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal any fine that is less than or equal to $5,000,000, and the Government agrees not to

appeal any fine that is greater than or equal to $50,000. The defendant also agrees not to appeal any forfeiture amount that is less than or equal to $80,869,117.10 and the Government agrees not to appeal any forfeiture amount that is greater than or equal to $80,869,117.10. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio* v. *United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

PREET BHARARA
United States Attorney

By:    _____
       Aimee Hector
       Brian Blais
       Rebecca Mermelstein
       Assistant United States Attorney
       (212) 637-2360

APPROVED:

_____
TIM KASULIS
Deputy Chief, Securities and Commodities
Fraud Unit

AGREED AND CONSENTED TO:

_____        _____
JASON GALANIS                         DATE

APPROVED:

_____        _____
Thomas Mazzucco, Esq.                 DATE
Attorney for Jason Galanis

Rev. 06.03.2016

# Exhibit B

# CONSULTING PROJECT

### 116-55 QUEENS BOULEVARD, SUITE 216
### FOREST HILLS, NEW YORK 11375

## PRE-SENTENCE MEMORANDUM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-vs.-

JASON GALANIS
Docket # S1 16 CR 00371-001 (RA)

HONORABLE JUDGE RONNIE ABRAMS

Respectfully submitted,

Mandi Budah, MA, LMSW
Forensic Social Work Consultant

Reynaldo Cusicanqui, B.A.
Forensic Mitigation Specialist
CONSULTING PROJECT

Lisa Scolari, Esq.
20 Vessey Street, Suite 400
New York, NY 10007
DEFENSE COUNSEL

July 26, 2017

**CONTENTS**

INTRODUCTION……………………………………….…….…………......................Pg. 3

PSYCHOSOCIAL DETAILS AND MENTAL HEALTH HISTORY...…………..………....Pg. 5

CLINICAL AND MENTAL HEALTH ASSESSMENT………………………………......Pg. 6

CLINICAL CONCLUSIONS AND RECOMMENDATIONS……………………………....Pg. 7

**INTRODUCTION**

This pre-sentence memorandum has been prepared by the Consulting Project, a private mitigation and forensic social work firm that assists defense attorneys with evaluations of individual clients and cases with a view toward presenting alternative pleas and sentencing possibilities to the Court and the United States Attorney's Office.

This pre-sentence memorandum is submitted by Reynaldo Cusicanqui and Mandi Budah, MA, LMSW on behalf of Jason Galanis, age 47, at the request of his attorney, Lisa Scolari, Esq. Mr. Cusicanqui has worked as a Forensic Mitigation Specialist and Sentencing Advocate since 1995. Due to his lengthy experience, he has knowledge of psychosocial contributors and extensive knowledge of criminal behavior derived from evaluating over 4,000 defendants in the state and federal court systems. He has also gained most of his forensic experience in mitigation from being appointed as a Senior Mitigation Specialist on numerous death penalty eligible matters in the United States District Court for the Southern and Eastern Districts of New York.

I, Mandi Budah have worked as a Licensed Master Social Worker since 2012 and additionally possess a Master's Degree in Forensic Psychology, obtained in 2010.  With my knowledge of psychosocial contributors and comprehensive knowledge of criminal behavior obtained from working with the Consulting Project, I conduct evaluations, prepare Pre-pleading and Pre-sentence reports for the court, and recommend necessary sentencing alternatives on criminal matters.   It is our specialty to provide the greatest amount of psychosocial background to the decision-making parties.   This ultimately allows us to enhance the appropriate classification of a defendant that is a risk to the community or a defendant that is deserving of a just and appropriate disposition.

In presenting this report, we wish to highlight certain mitigating factors and respectfully recommend a concurrent sentence for Mr. Galanis.  These mitigating factors are:

- The social circumstances of Mr. Galanis' childhood and early adolescence impaired his identity formation and increased propensity for development of later mental health issues and poor decision-making skills

- As a result of his stressful and traumatic upbringing, Mr. Galanis has developed a maladaptive set of coping skills, used for problem solving, decision making and conflict resolution

- Exposure to power-assertive parenting practices and family stress led to aversive cognitions of himself and the world around him

- The absence of Mr. Galanis' father due to incarceration resulted in a negative impact on secure attachment, identity development and vocational orientation

- Exposure to criminal conduct and norms during critical human developmental stages set the foundation for later formulation of values, morals and beliefs, which were antisocial in nature, and later affected career aspirations

- Aside from noted dysfunctions, Mr. Galanis has been able to consistently provided financial and emotional support to his wife and immediate family

The information in this memorandum is based on four in-person interviews with Mr. Galanis, conducted by Reynaldo Cusicanqui and Mandi Budah at the Metropolitan Correctional Center located in Manhattan, New York.  In addition, an in-person interview was conducted by Mandi Budah with Mr. Galanis' wife, Ms. Berger and a phone interview was conducted by Mandi Budah with Mr. Galanis' mother.

**PSYCHOSOCIAL DETAILS AND MENTAL HEALTH HISTORY**

According to Chandra Galanis, Jason's mother, Mr. Galanis was born via forceps delivery following 24 hours of labor.  Following his MMR vaccinations, Mr. Galanis developed a seizure disorder and high fevers, which required hospitalizations at Lenox Hill Hospital on four separate occasions.  He was placed on phenobarbital until the age of three, when the seizures ceased.  At the age of 15, Mr. Galanis sustained significant injuries from an ATV accident in California.  According to reports, he suffered multiple fractures in both of his arms, as well as his femur and according to Ms. Galanis, was hospitalized for approximately one month.

Though Mr. Galanis has never received a mental health diagnosis, during his clinical interview he presented with symptoms consistent with a history of anxiety and depression.  Ms. Galanis reported that her son has always been insecure, shy, an overachiever and lacked self-esteem.  Mr. Galanis reported most of his life he has "felt like an outsider" and often was embarrassed of his father's actions and behaviors.  This resulted in Mr. Galanis often deflecting a situation with or comments from peers, adding to the mental pressure he was already experiencing.  According to Ms. Galanis, following the ATV accident "something changed."  She reported noticing increasing symptoms consistent with depression and a significant change in his temper.  She reported taking her sons to a psychiatrist one time in California, but did not continue care.

When Mr. Galanis' father was arrested and taken from the home at 16, he described "feeling anxiety all the time."  He recalled often feeling bullied, afraid of and intimidated by his father, lacking the ability to stand up for himself, which resulted in additional symptoms consistent with depression and anxiety.   He described feeling "self-conscious" and had an increased "fear of being judged."  Lacking confidence in himself, Mr. Galanis often finds social

5

situations to be difficult, "latching onto" someone he knew for the duration of an evening. During his interview, he could be seen biting his nails and continuously tapping his foot on the floor, both indicative of an anxiety disorder.

## CLINICAL AND MENTAL HEALTH ASSESSMENT

Mr. Galanis is a 47-year old married, Caucasian male who presented in session as older than his stated age, with long hair and a long beard, of average build and dressed in a correctional uniform. He displayed good eye contact and presented with an anxious, yet cooperative demeanor. He displayed appropriate behavior and spoke at a typical rate of speech with clear clarity and ordinary intensity of volume and flow. He presented with affect congruent to the situation and a moderate level of anxiety, as evidenced by the shaking of his leg. His mood appeared mildly depressed and he failed to recall specific details of his life. Psychomotor behaviors were within normal limits and he presented with adequate attention and concentration. He demonstrated intellectual awareness and emotional insight into his current situation. Though he denied feelings of hopelessness and worthlessness, he reported extreme shame and embarrassment for his actions. Thoughts were consistent with reality and there is no evidence of a thought disorder. He denied all current high-risk symptoms including suicidal and homicidal ideation, intent and plan.

It is evident that Mr. Galanis is struggling from the effects of a multitude of negative experiences throughout his life, namely years of family stress and the impact of his upbringing and father's high-profile criminal convictions, all which occurred during critical stages in his life. These early experiences set the stage for later challenges and difficulties in global reasoning. Based on our clinical experience, records reviewed and working with the offender

population, Mr. Galanis has developed a maladaptive set of coping skills in response to enduring years of lifestyle instability, leading to the lack of successful identity formation and social and emotional development as an adult.  From a young age, he has struggled with meager emotional support and difficulty in self-regulation of his emotions, which has manifested in a lack of logical reasoning, appropriate judgment and inadequate global decision making.

## CLINICAL CONCLUSIONS AND RECOMMENDATIONS

Studies show, parenting and family stress are predictors of early childhood internalizing difficulties, which is a disorder. An internalizing disorder is a type of emotional and behavioral disorder in which an individual will keep their problems to themselves, or internalizing the problem, leading to mental health issues that include anxiety and depression.  Internalizing problems in childhood consist primarily of mild anxiety and some depression and have high prevalence rates in modern communities, affecting up to 20% of children and adolescents.[1] Internalizing problems demonstrate continuity over time, with half of children retaining clinical diagnoses over several years without proper intervention. These ongoing emotional disorders result in significant distress for young people and families and will persist throughout the life course without timely intervention.[2] Predictors of early childhood internalizing difficulties include over-involved/protective parenting, low warm-engaged parenting, and parental anxiety and depression.[3] Family life-stress and parental anxiety and depression also predict problematic parenting practices which influence children's internalizing difficulties.   Mr. Galanis was

---

[1] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology*, *27*(6), 542-559.
[2] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology*, *27*(6), 542-559.
[3] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology*, *27*(6), 542-559.

exposed to a myriad of childhood and family life stressors, contributing to his development of anxiety and depressive disorders at later stages in his life.

Scholars conducting research on children's anxiety, depression, internalizing disorders, temperamental inhibition, peer withdrawal, and insecure attachment, have revealed common themes regarding links of such behaviors to parenting.[4] Positive parenting, associated with children's emotional development, includes warm-engaged practices that are nurturing and receptive to children's communication, as well as, autonomy-encouraging practices that help children master tasks in achievable steps and to explore, reason and make independent decisions. Such parenting practices encourage children's internal beliefs that they are valued and that caregivers are a safe haven in times of distress; a secure base from which to explore. These early practices set the foundation upon which children build their values and beliefs, as well as coping styles that persist throughout childhood and into adulthood.

In contrast, several parenting practices are believed to contribute to children developing internalizing problems. Low warmth can present as a lack of involvement and caring towards children, or as overt rejection that portrays children as inadequate. Power-assertive and punitive parenting practices control children forcefully with yelling, hitting, and demands for obedience. Over-involved/protective parenting shields children from natural life challenges and opportunities to develop skills for managing difficulties.[5] This can include intrusion, encouragement of dependence, and exclusion of outside influences. These parenting practices can lead children to develop aversive cognitions about themselves and the world. Unpleasant interactions with parents evoke emotional distress in children, who then learn that primary

---

[4] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology*, *27*(6), 542-559.
[5] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology*, *27*(6), 542-559.

relationships do not provide support and safety.  Mr. Galanis reported a history consistent with power-assertive and unpleasant interactions with both of his parents.

Family stressors linked to children's internalizing problems include traumatic events, conflict between parents, low social support, daily hassles with parentings, and drastic changes in socioeconomic status, many of which Mr. Galanis experienced at a young age.[6] These life stressors can directly impact children by eliciting perceptions of low control, negative expectations, self-blame, and hopelessness. Scholars conclude, as a result, that parenting practices predict child internalizing difficulties cumulatively over time.[7] Just as parenting practices influence potential development of anxiety and depressive disorders, a parent or caregivers' occupation can influence the child's goals and aspirations as they relate to career attainment, as in the case of Mr. Galanis, pursuing business and finance similar to his father.

According to research, a man's occupational level has been found to be a highly useful indicator of his family's social status in the community and a good predictor of his children's life chances.[8] A father's occupational level sets important limits on the social status of the son's probable occupational destination. Scholars commonly assert that a father's values concerning work and achievement in the occupational world are communicated to their sons.[9] Since the father is considered to be a significant role model for his sons, his absence (or incarceration as in the case of Mr. Galanis) or inadequacy is often claimed to have adverse consequences for the child's developing masculine identities and vocational orientations.

[6] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology, 27*(6), 542-559.
[7] Bayer, J. K., Sanson, A. V., & Hemphill, S. A. (2006). Parent influences on early childhood internalizing difficulties. *Journal of Applied Developmental Psychology, 27*(6), 542-559.
[8] Mortimer, J. T. (1974). Patterns of intergenerational occupational movements: A smallest-space analysis. *American Journal of Sociology, 79*(5), 1278-1299.
[9] Mortimer, J. T. (1974). Patterns of intergenerational occupational movements: A smallest-space analysis. *American Journal of Sociology, 79*(5), 1278-1299.

Children from disrupted families are at increased risk of antisocial behavior and delinquency compared to children from intact homes. Studies consistently report that children experience a range of psychosocial problems during parental imprisonment including: anxiety and depression, hyperactivity, aggressive behavior, withdrawal, regression, clinging behavior, sleep problems, eating problems, running away, truancy, poor school grades and delinquency, many of which Mr. Galanis experienced himself.[10] Prisoners' children are also likely to be exposed to parenting and family risk factors for delinquency before the imprisonment takes place.

Major factors that affected Mr. Galanis included, having a father with a history of incarceration, which increased his risks of delinquency, criminality, incarceration and other problem behaviors. Seeing a father arrested, visiting him in prison, and dealing with paternal absence may traumatize children, as will the cycle of imprisonment and release that often follows. Diminished financial contributions from the father during and after his incarceration and the costs associated with having a family member incarcerated can diminish the financial resources available to children. When diminished financial resources and the trauma of paternal absence are coupled with the stigma of paternal incarceration and possible increases in detrimental parenting behaviors that result, the effects of paternal incarceration on children will be exacerbated.[11]

It has also been suggested that the experiences and requirements of a man's work, through their effects on the father's attitude, may influence the socialization of his children.[12] The degree of prosocial socialization is mediated by the father's availability, adequacy and

---

[10] Murray, J., & Farrington, D. P. (2005). Parental imprisonment: effects on boys' antisocial behaviour and delinquency through the life- course. *Journal of Child Psychology and psychiatry*, *46*(12), 1269-1278.
[11] Wildeman, C. (2010). Paternal incarceration and children's physically aggressive behaviors: Evidence from the Fragile Families and Child Wellbeing Study. *Social Forces*, *89*(1), 285-309.
[12] Mortimer, J. T. (1974). Patterns of intergenerational occupational movements: A smallest-space analysis. *American Journal of Sociology*, *79*(5), 1278-1299.

individual parenting practices, often limited for Mr. Galanis, as his father was incarcerated for an extended period of time. The evidence proposes that autonomy-related dimensions of a man's work, such as complexity, functional focus, and closeness of supervision, influence his child-rearing values. The research provides evidence that 3 attributes of the father's work are sources of values which are transmitted to sons and reflected in the occupational preferences of the next generation. These attributes include; the extent of work autonomy, the characteristic rewards of the occupation, and the predominant function of the work itself.[13]

Exposure to work related norms and values of the father imparted to the son can influences the son's later career aspirations. Similarly, exposure to norms and values that are antisocial in nature can influence later values and aspirations that are criminal in nature. The essence of differential association theory, summarized, asserts that overt criminal behavior has, "as its necessary and sufficient conditions, a set of criminal motivations, attitudes and techniques, the learning of which takes place where there is an exposure to criminal norms in excess of exposure to corresponding anti-criminal norms during symbolic interaction in primary groups."[14] In short, an individual who is exposed to more criminal norms than they are anti-criminal norms during critical developmental stages, is more likely to internalize these norms and formulate specific values and beliefs that are antisocial in nature. As in the case of Mr. Galanis, the exposure to his father's business transactions and modeling behaviors set the foundation for his own involvement in later criminal behaviors and actions.

Research has proposed a theoretical explanation that was developed to explain white-collar crimes. The "fear of falling" hypothesis, or the notion that the motivation for crime is the fear of losing what one has worked so hard to obtain, which is alignment with Mr. Galanis'

---

[13] Mortimer, J. T. (1974). Patterns of intergenerational occupational movements: A smallest-space analysis. *American Journal of Sociology*, *79*(5), 1278-1299.
[14] Jackson, E. F., Tittle, C. R., & Burke, M. J. (1986). Offense-specific models of the differential association process. *Social Problems*, *33*(4), 335-356.

beliefs, values and motivations.[15] This is in stark contrast to the traditional "the more you have the more you want" theories. Scholars believe that losses will matter significantly more than gains to an individual's relative standing, location, or position in society.[16] As a result, it is not the motivation of getting more or getting ahead, but rather the trepidation of losses that influences offender decision making. The "fear of falling" hypothesis applies equally to the loss of status and prestige as well as to the loss of financial means.

It is evident that Mr. Galanis has endured a series of negative experiences throughout his development, suffering significant physical, physiological and psychological consequences. From an early age, he was exposed to a myriad of family and life stressors, which developed into anxiety and depressive disorders, subsequently impacting his coping, decision making and problem-solving skills. Nevertheless, he has continually maintained employment, has been married for 11 years and has served as a significant contributor financially and emotionally to his family. He has been instrumental in the support of his wife who has suffered life-altering changes as a result of Mr. Galanis' absence. Both Mr. Galanis and his wife will be at risk of substantial difficulty and decline should he be sentenced consecutively. For these reasons, it is our professional opinion that Mr. Galanis be given a concurrent sentence.

We do not intend on negating the alleged behavior that led to his arrest, but respectfully request that the Court consider the existing mitigating factors and acknowledge that a consecutive sentence will not serve to promote accountability, responsibility and respect for the law. Mr. Galanis has demonstrated remorse and has started reflecting on his actions. He has been teaching finance classes while incarcerated and has been utilizing his knowledge and expertise to assist other inmates, which has provided him with a sense of purpose.

---

[15] Piquero, N. L. (2012). The only thing we have to fear is fear itself: Investigating the relationship between fear of falling and white-collar crime. *Crime & Delinquency, 58*(3), 362-379.

[16] Piquero, N. L. (2012). The only thing we have to fear is fear itself: Investigating the relationship between fear of falling and white-collar crime. *Crime & Delinquency, 58*(3), 362-379.

The Consulting Project would like to thank the Court and District Attorney's Office for its review and consideration of the contents in this memorandum and respectfully request that the contents of this pre-sentence memorandum become a part of the commitment papers for classification.

Respectfully submitted,


Mandi Budah, MA, LMSW
Forensic Social Worker


Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT

# Exhibit C

:

Dear Judge Abrams,

I am so very very sorry for my misdeeds and the damage that I have caused. I'm a man with broad shoulders, as I was required to take on  responsibility from an early age, but these shoulders now need to carry a lifetime of shame.  Prison provides seemingly endless hours to be alone with one's thoughts, and being alone with mine is a tormented process of reflection that lays bare my failures in judgment.

I want to assure that the Court  that I will never be back in prison - not ever. I'm deterred. I want you to know  how I am sure of this.

I've spent 15 months at MCC; two birthdays and a wedding anniversary; 15 months in Unit 5 North; 15 months in cell # 535. The 68 square feet I've shared with just two different cellmates to whom I am grateful to for teaching me the rules of prison.

Just outside my cell I've seen horrors - true horrors. Horrors that would scare straight any Wall Streeter . It has been particularly terrifying for me  though, because I grew up in Greenwich, Connecticut and attended private preparatory school. As an adult, I've lived in Beverly Hills,   Mayfair and South Kensington in London--each utterly nonviolent environments. Eighty of the other ninety five inmates in my unit are from the Bronx and are charged with being  part of drug trafficking organizations.  They are charged in indictments with thirty, fifty and

one hundred plus co-defenants, many of whom are in the building. The vast majority are "kids", twenty-five years my junior.

Since being here I've watched them administer savage seven on one beatings; Iv'e watched medieval fights where they use weapons made of combination locks in gym socks to smash a man's face; I watched a man's front teeth knocked out with one punch. I've watched gang members: "Apes", "Prime Times", and "MacBallers" exact revenge on each other continually. The worst assault I saw was just ten feet from my cell in which a man was attached from behind with a razor-his his face was sliced open from mouth to ear for  gang disloyalty. MCC staff tells me that this isn't how federal custody used to be, but it is very much so now.

Your Honor, I am forever traumatized by what I have witnessed here. I will not ever be able to get this out of my mind. I will never take a risk that puts me back into this environment even for a night. The last 445 days at MCC have left an irreversible psychological impression on me. No reasoned person, no matter how ambitious, would ever risk coming back to this - not for any amount of glory, ego, validation, or treasure.

In the midst of drowning in this dystopian alternate universe I found the edge of the pool to hold on to. I found something constructive to do. I found teaching. I found giving back.

I was required to pass an eight hour tutor certification course administered by the MCC Education Department to become a GED tutor. I initially took on five GED candidates as my responsibility. I later expanded the education opportunities in 5 North by taking on pre-approved curriculum, including classes on Entrepreneurship, Business Acumen, and Bookkeeping. These three classes started with about twenty-five students and rapidly grew to thirty-five  to forty-five per class, through word of mouth. I've graduated six classes, which I am proud of.

I've learned how to adapt and how to get through to even the roughest, toughest Ape or MacBaller, and to earn their respect. I found that I could empower them with knowledge and inspire them with practical, achievable guidance.

I believe I showed them the reality of how money works - a better legal route to earn their "paper", "bread" or "chicken".

In Entrepreneurship class, as an anecdote, we talked about reputation, but not street reputation. Not reputation where you are feared, or envied, or getting 'good money' for being fronted drugs. We learned that your real reputation in the legitimate world is reflected in your credit report. It is the path to financing your small business. It is your standing in the financial community. It will help rent you an apartment or buy your first house. It is a measure of your reliability.

Several students decided to start on the path of repairing their credit reputation while they are away by obtaining secured VISA cards (a credit card secured by a small savings account). I taught them them to carry no balance but to instead be smart by using the VISA card to receive the weekly commissary deposits and to immediately pay off the card with the money that was going to be sent by Moneygram. Some students are very smart and got it instantly. No one has taken the time to teach them things like this.

We also learned about business plans; corporations vs LLCs; and venture capital negotiation. In our venture capital discussion one of the more wild young MacBallers spoke up and participated (though they normally do this in front others) Insightfully he offered that venture capital negotiation sounded to him like what they do on "Shark Tank" - a famous TV show where entrepreneurs negotiate terms with financiers. This is a moment I will always remember. He was engaged. He was in an environment in which he could speak up and be recognized. I enabled that. His comment provoked 60 minutes of additional dialogue with the group.

Also, outside the "classroom",  I've helped talk through dozens of business plans brought to me; a car wash; a record label; a door to door van service; house flipping; a liquor store; and numerous franchise aspirations. We've spent countless hours strategizing on how, as felons, they can still finance their business plans. That they don't have to take  no for an answer, that  "no" only means that your audience doesn't "know" yet. They're learning that it's their job to educate themselves and the educate their investors about why they're worthy.

I made it clear that it is hard work, but that contrary to what they believe the "feds" don't want to "hold you down". The federal government wants businesses to be successful, to you pay them taxes and employ workers. This concept registered. It's an example of how I translated concepts in a way they understood.

I showed them there are federal agencies (ones with the dreaded three letter acronyms)  that want to help them, not hurt them. For example, the SBA has programs for felons. They were stunned to hear that they already knew, but didn't realize, that the head of the SBA  was It is the co-founder of World Wrestling Entertainment. I meant to make it more real for them so it seems more attainable. I informed them that before the WWE, and before becoming a household name and a billionaire, that Linda McMahon filed for bankruptcy. I illustrated that you must try, and sometimes fail, that you must learn from failure, including those failures that lead us each to MCC.

Your Honor, as a white collar offender it would have been more likely and perhaps more convenient to try to keep my nose in a book for the last 15 months. I chose

something that was uncomfortable for me personally instead. I know in the process that I inspired the thinking of at least a few of my students.

Pragmatically, too, I know I made a difference for them with the BOP. "Programming" can lead to improvement in their BP-337 Base Score (for GED), and also enhance their BP-338 Custody Score, both of which I showed as tangible examples of direct benefit for putting in the time. The "young'ins" call me "old head." This old head was grateful to make an impact.

Your Honor, I am capable of being compliant as a free man. I have thought about my transgressions and realize that my ambition and insecurities led me to make critically bad choices, choices that I am humiliated over. I regret my actions for so many reasons, most of all for the harm that I have imposed on my family, my business associates, and investors.

I am also saddened that I squandered a life that had promise. I had the opportunity to achieve the validation that I have always sought. And I squandered it. I led the structuring of a 2014 transaction with an American registered investment advisor that was conflicted, improper, and illegal. This decision was not in the heat of the moment and not out of a lack of alternatives. It was designed to maximize my economic upside, but all it did was fully maximize my demise, and that of others around me.Through my conduct I managed to "snatch defeat from the jaws of victory."

Shocking prison conditions already have profoundly impacted my perspective, but I have at least a decade yet before me. This is daunting and its hard not to be despondent. To counter these feelings I keep close at hand a few precious

letters, one of which is from a friend that is five years into a ten year federal sentence.

He wrote:  "Prison and this whole experience is what you make of it. This can be a time of personal growth, reflection, and a reset.  Or this can be just a waste of time, where one gets bitter, points the finger at others, and blames everyone else.

This CAN be a time to increase your personal awareness and consciousness.

This CAN be a time to reconsider the priorities one has in life.

This time in prison CAN be whatever one chooses it to be.

A person can leave prison better, the same, or worse than when they were when they came in. It is simply a choice.  Most leave the same or worse.

They serve their time, instead of making the time serve them."

These wise words have been sustaining to me. They also will influence the rest of my time in prison.

Your Honor, I am not sure what I will do as a free man a decade or more from now. No matter what it is I know it will be constructive and rewarding. I am incarcerated, but i am already free; free from my old life and free from expectations. Hopefully Operation Gratitude will have a paid position for me. Alternatively,  I will figure out a way to earn a living while working with an animal rescue oganization.

Whatever it is that I am to in the future is for another day. In the present I am overwhelmed with remorse. I am truly sorry for my decisions. Words aren't nearly enough, but they must be said to those I've hurt or disappointed. I failed in fulfilling my responsibilities - I will use my life skills to make up for whatever I can, however I can. This much I know.

Pleas have mercy upon me.

Jason Galanis

# Exhibit D

Monet Berger

9903 Santa Monica Blvd #719
Beverly HIlls , Ca 90212
monetberger@mac.com
310 770-7512

Hon Ronne Abrams
United States District Court
Southern District of New York
New York, NY 10007

Dear Judge Abrams,


I have know Jason over 20 years and  shared the past 20 years by his side as his life partner.  I love him very much and he has been a loyal loving partner to me.   He is a friend to all who know him, and always there to help out in anyway.  He would help a stranger get his car out of snow bank,  just as he would be there for me during health issues.   I went through medical treatment and I have a fear of  needles and Jason made sure he as home every evening at 5pm to give me my shots as I could not handle doing it myself.  He was always a calming loving supportive man who I could always depend to be there for me.   He also  has  a love of  animals  like no other . A few years ago we were driving home from dinner and he saw a hawk on the side of  the road, when we got home he insisted on going back to see if  it was injured.  He took the hawk in his car back to our house, made a bed for it with blankets  and found the hawk rescue facility, which was 90 minutes away, and drove  the hawk there at night so it could get proper care, made a donation for the hawks care and monitored it daily.


I have witness the struggle he has had with his family  and the painful impact it has had on him since he was teenager.  His father went to prison when he was a young teenager and I truly believe the damage of this has governed the greater part of his adult life.  He was forced to  drop out of collage to support his mother and his brothers, all while trying to still be a good son and visit his father in prison while looking after the family.   He had to give up his own dreams and his own life to become  a caretaker to his younger brothers and his mother for his entire life.   His father had such a hold over him Jason did not stand a chance against him.  The father has used his 4 sons as human shields through out their lives with no regard of the damage and harm he has inflicted upon them.  I was a witness to it throughout our life together and it was painful and

upsetting to see the impact it had on Jason.  I can not help but wonder if he had counseling regarding these issues with his father  maybe he would not be in this situation today.  His father seemed to have some spell over him and Jason felt he had to engage him.  Jason has made mistakes, and he knows that, I am begging you  to please consider the mental hardships he was under due to  this  unhealthy relationship his father imposed on him.  The impact of this father son relationship has destroyed him.  I know Jason  has such regrets for that as it has ruled his adult life.  I hope he has another chance to become the man he should be without the influence of his father in his life.  Jason knows what he did was wrong and the gravity of the  crime.  His father was out of his life for many years, and somehow he manipulated his way back into Jason's life, by using the family bond.  No child should have been put through what Jason was growing up, and then to suffer his entire life with the emotional damage his father caused is too much for any man.  Yet  Jason was still loving and cared for his family, even though they really only cared for him to handle their   financial needs.

The past 5 years Jason has been working with Operation Gratitude and I saw a shift in him.  He worked there at least one 8 hour day per  week,  and then often again on the weekend .  I often went with him on the weekend .  I saw how this type of work brought out a different side of Jason.  He felt so good about himself and helping others.  He would take the volunteer vets out for lunch and enjoyed their company and spending time with them, and making them feel important and admired them  for the work they had done for our country.   He was respected and loved by everyone there.  He worked so hard lifting  heavy  boxes all day  and assembling packages for the troops.  He never left early and helped out in anyway he was asked. This is the side of Jason  that not was not allowed to be developed when he was younger under his family influence.  I saw the satisfaction and happiness and self  worth  it brought Jason to volunteer.  He was so committed to it, and I was very proud of him for it.  This is who Jason is , someone who cares about people and being respected for the hard work he does  and giving back to the people who have served  our country.  Jason knew the other volunteers  wanted to see the Dodgers play and organized for all the vets to go see the game which was a special night for everyone.  Jason quietly helped out many of them with issues they had and never bragged about doing so.   He would make paracord bracelets at home for the troops to be included in the care packages.  We would do this at night at home  while spending time together, he must have made over 1,000 bracelets for the troops!

I ask you to please consider this side of Jason when you sentence him.  He is a kind caring hard working man who cares about others well being.   His business life might be finished due to these mistakes,  but he has much to offer the community through his service and kindness and compassion for people. He has been incarcerated now for over

8 months and has had the time to reflect on his mistakes and knows he acted improperly. I know he wants to move forward with his life without having the influence of his father over him.   Thank you for reading my letter and  my request to consider leniency towards Jason.

 Sincerely,
Monet Berger

Honorable Ronnie Abrams
United States District Court
Southern District of New York
New York, N.Y. 10007

Dear Judge Abrams,

I am writing in regard to Jason Galanis. Jason has been one of my closest
friends for the last 11 years. We met through mutual friends in 2006 and
instantly he became one of my closest friends. Today I consider him almost
family which is why I find the situation he is in to be so tragic.

I've spent thousands of hours with Jason in many different capacities. This
may sound strange given his current situation but Jason has always been a
trusted advisor to me in relationships, career, life learnings and even my
children. The best example I can give is with my children who I may never
have had if it weren't for Jason but have now become the most amazing part
of my life. Jason and his wife were trying to have kids before my wife and I
were and it just wasn't happening for them. My wife wanted to have children
but I had never had the desire and was really fighting it. The rift was causing
problems in my marriage and was beginning to place a lot of stress on us. I
told Jason I wasn't sure about having kids and he was the one that sat me
down and told me how much it would mean to him to be able to have them
and how he thought it would be great for me. His advice helped move me in
that direction and now I have two amazing sons that have changed my life in
ways I couldn't have imagined just like he said they would. He was right
about that and so many other things.

I talk to Jason all the time through email and I know he's remorseful for what
he's done and not just in this particular episode but in the life he's lead. I
think he sees now the potential that is inside him. My fear is that the situation
he's in steals his desire from him. What I mean by that is that right now he
wants to change and do good for society but at some point I think the fire in
him will be extinguished and then we all lose. If rehabilitation is truly the
desired end result then it's a fine line between that and destruction of ones
soul that needs to be constantly managed. Please don't let that destruction

happen because Jason still has a lot to offer. He's now teaching other inmates basic finance and it's giving him a sense of purpose and joy I haven't seen in years. It's also shown him that he has a lot to offer others and that is something that should be strengthened and not destroyed. When Jason does finally get released I promise you that I will personally help him find his path in life and keep him on it. We would all benefit from that.

Jason is a man with an incredible intellect and a huge heart. His loyalty to family and friends is deeper than anyone I know. He is truly one of my closest friends and to see him in the place he is breaks my heart. I hope you can find it in your heart to show him leniency because in my opinion Jason has so many amazing gifts that could and should be shared with the world if he's given the chance. From this episode I believe he has learned the most important lesson a man can learn and that is who he truly wants to be and what he can and should bring to the world.

It's hard to get a sense of a person through one letter but I hope this conveys a little bit of insight into the Jason I know. I'm certain you're incredibly busy but if there is anything I can do to help with that insight I will certainly do it. This may be unorthodox but if you ever want more of my view my phone number is 310.592.8063 and I would even be happy to fly out to New York and sit down with you or anyone else and chat or answer questions about the man I know. As I said before he's like family to me and I'll do anything I can for him.

Respectfully yours,

Todd K. Parkin

Honorable Ronnie Abrams
United States District Court
Southern District Court
500 Pearl Street
New York, N.Y. 10007


Dear Judge Abrams,

I am writing this letter as a friend of Jason Galanis and would like to provide you a character reference. I have known Jason for over ten years and I am very saddened by his current situation. During the time that I have known him Jason has proven time and time again to be one of the best people I know. He is a devoted husband, very generous and supportive friend and fiercely loyal to his family. He is a man of exemplary character with class, respect and kindness.

It pains me to think of him in the place that he is in now. All of us make choices that lead to where we are in life and we all must bear what consequence that follows. But above consequence, I believe even stronger in second chances. I truly feel that a man with Jason's talent and qualities should be given a chance to prove that he has so much more to give to the betterment of everyone around him. I have witnessed many times when a friend is in need it was often Jason who was first to offer and step up to assist in anyway he could. His generosity towards his family and the way he cares for everyone around him shows the strength in him as a person.

Jason is a good man and I implore you to consider the man you will be judging beyond what you see on paper and consider the man that he could be if he were to be given a chance from you. Please consider allowing him another turn as I know he will be able to prove to all of us that he can be what we would all like to see of him and exceed our highest expectations.


Sincerely,

Sunida Parkin

Deidre Powell
Rodeo Realty Fine Estates
11940 San Vicente Blvd
Los Angeles CA 90049
310.850.1069
DeidrePowell@RodeoRE.com

Hon. Ronnie Abrams
United States District County
Southern District of New York
New York, NY 10007

Dear Judge Abrams,

I'm writing to you because I've known Jason Galanis 22 years. We met in San Diego through mutual friends during collage. Over the years I have become extremely close to Jason. His wife Monet is my closest, dearest friend.

My partner of 17 years and I have spent many evenings, weekends and Holidays together. We have traveled with them often throughout the years. You really get to know a person spending as much time as we have, over the past two decades.

I'm very observant and have always found Jason to be extremely sensitive and kind. He's always been there to lend a hand, help you out, extending himself to others and no more so than to his family and friends. Never with strings attached or expecting anything in return.

Jason treats everyone with dignity and respect. I've seen him interact with so many different individuals, always acknowledging, asking their names and about them. He looks you in the eye, never dismissive or rude.

When I was training to get my pilots license, Jason was always encouraging me, cheering me on. The day I took my first solo flight, Jason showed up to support me. He stood with my instructor on the observation deck and watched me takeoff and land multiple times and was there to greet me when I finally landed. It was the happiest day of my life and Jason was there to share that moment with me. That is a true friend.

I can only tell you that Jason has been nothing but consistently honorable and kind with me over the years I have known him. I'm heartbroken for him, his wife Monet and no more so than his victims.

Please consider his time served and rehabilitation. Jason is capable of and doing wonderful things and helping people, if given the chance. And not under the control and manipulation of his Father, who has been a dark force in his life.

Thank you very much for your consideration Judge.

Sincerely,

Deidre Powell

**Jesse Norman Galanis**
**3204 Summer Set Way**
**Oceanside, CA 92056**
415.706.7834

Honorable Ronnie Abrams
U.S. District Court, Southern District
New York, New York 10007-1312

Dear Judge Abrams:

I am writing this letter on behalf of my oldest brother, Jason Galanis. Jason and I
have a 12-year age difference. Because of the large age gap, and because my father
was incarcerated for a significant portion of my childhood, Jason and I did not
always share a typical sibling relationship. Often Jason was forced to take on a
more fatherly role, working to help provide for our family when times called for it.

Reflecting on my experience with Jason and his character as an older brother, I
recall him as a relentlessly, hard working man who was forced to grow up very
quickly, perhaps too quickly, due to our father being incarcerated. In Jason's late
teens and early twenties, he left university early to work to provide, not only for
himself, but also for our mother and my three brothers.

Growing up, I looked up to Jason's hardworking mentality and his willingness to try
to provide for our family. In this sense, I certainly had a view of Jason as a father
figure. There were times that I did not see Jason often, probably partially due to his
dedication to providing for our family. However, I knew that he was always there
for me. For instance, one day we realized that my bike was stolen by another young
man living in our neighborhood. Jason, without any hesitation whatsoever, marched
over to his home and was able to get my bike back for me without incident.

I have many fond memories growing up with Jason. As a child, Jason would take my
brother and I on trips to local mountains to ski and sled, or to amusement parks
with friends. We would play hide and seek around the house. Having an older
brother in my life like that was and remains extremely important to me.

As we have grown older, I have seen Jason continue to pour his heart and soul into
his endeavors. He is one of the most determined and talented men that I have ever
known. Despite this, I understand that Jason has made grave errors that will cost

him dearly and I understand that he has pleaded guilty to securities fraud charges in the case before your Honor.

I can say that knowing Jason for my entire life, as my oldest brother, that I have a unique perspective on his character. I truly believe that Jason will be a productive member of society in the future after he serves his sentence. I can only hope that your Honor will consider these words in sentencing my brother and I humbly request the utmost leniency for Jason. Thank you for your time.

Respectfully submitted,

Jesse Norman Galanis

Alfred M. Merrin
8 Spruce St.  Apt. 26A
New York, NY   10038


Hon. Ronnie Abrams
United States District Court
Southern District of New York
New York, NY  10007


Dear Judge Abrams,


I am writing in support of my friend, Jason Galanis, in his time of crisis.  I only have a superficial knowledge of his legal difficulties since our relationship has only been personal and never professional. So I can only attest to the steady, loyal and generous character he unwaveringly displayed in his personal relationship with me.

I met Jason approximately 10 years ago after my wife befriended his lovely wife, Monet.  Even though he was younger and we had no common business interest, I found him an immediately engaging, attentive, and intellectually inspiring young man.  In short order, we all became good friends. Jason and Monet always spent Christmas with our family, and our three children always awaited Jason's arrival with joyful eagerness.  Like everyone, they found his kind, fun-loving nature irresistibly compelling.

One thing I always judge a man on is his relationship with his wife or partner.  And Jason has aways shown me to be an unusually devoted, committed and honest husband.  In all the years I've known him, there has never been one instant when he hasn't treated his wife with the utmost love and respect.

At his core, there is no doubt in my mind he is as gentle and kind a soul as God has put on this earth. Whatever transgression he has committed cannot change that, and I am sure that once he has worked through these mistakes the best of his nature will prevail and he will live his life as the good, kind-hearted, gentle man he truly is.

Thank you for reading this, and I hope it has helped reveal the true nature of Jason and in some small way convince you to reduce his sentence.

Yours truly,
Alfred M. Merrin

Exhibit E

February 7, 2017

Honorable Ronnie Abrams
United States District Court
Southern District of New York
New York, New York 10007

Dear Judge Abrams,

I am the Founder and CEO of Operation Gratitude, a 501(c)(3), volunteer-based non-profit organization that sends care packages and messages of appreciation to all who serve. I started Operation Gratitude in my home on March 20, 2003, and with the engagement of hundreds of thousands of volunteers over the years, have now sent over 1.7 Million care packages to troops deployed in harm's way, to their children anxiously waiting at home, and to Veterans, First Responders, Wounded Heroes and their Care Givers.

In 2012, while Operation Gratitude was housed at the Army National Guard Armory in Van Nuys, California, Jason Galanis began volunteering for the organization. By virtue of his youth (relative to most of our retiree volunteers!), energy, physical ability and passion for the cause, Jason quickly became a most valued member of the Operation Gratitude family.

Jason volunteered almost daily during our busiest times of year, providing crucial assistance at a time before we could afford paid staff. Not only would he willingly take on the grittiest of jobs (such as standing inside the dumpster to direct the flow of garbage, picking up trash from the premises, and water-proofing product stored outdoors to protect against the elements), but Jason also took the time to attend a forklift class and become a certified driver, so he could assist in moving pallets of packages and process thousands of tons of donations delivered daily.

Operation Gratitude volunteers are the most diverse group in America: People from all socio-economic backgrounds, religions, physical and mental abilities, ethnicity, race, age and political persuasion, who join together in common cause to say "Thank You" to all who serve. Jason got along and related well to every volunteer with whom he engaged. He always had a smile on his face and lent a willing and welcoming hand. Jason was truly a model volunteer. Within months of his service to the organization, I invited him to become a "Blue Shirt Volunteer"--responsible for guiding other volunteers, especially on our Assembly Days, when upwards of 800-1000 people would devote themselves to making care packages for our Military.

As we were co-located on a Military base, our volunteers often had interactions with the Soldiers who worked full-time at the facility. They too were drawn to Jason, as he always treated them with the utmost respect and kindness.

Jason did more than just the physical activity in his support of Operation Gratitude--he invited his own family and friends to both volunteer with us and to donate items for the care packages. As a result of Jason's outreach, Operation Gratitude received thousands of decks of playing cards that were included in the care packages -- a huge treat for the troops in Iraq and Afghanistan (including my own son at that time!) who received them. Jason's lovely wife, Monet, brought groups of her friends to volunteer at our Assembly Days as well--an energetic and productive group!

Jason Galanis is an extremely kind, generous and caring individual. He is a man who can--and wants to- do good for our nation and those who defend it. I respectfully urge Your Honor to grant leniency to Jason and release him back to his loving home and charitable life.

Fondly,

*Carolyn Blashek*

**Carolyn Blashek**
**Founder & CEO, Operation Gratitude**
**310.876.2595 | 818.406.5057**

**OPERATION GRATITUDE**
16444 Refugio Road ♦ Encino, California 91436

www.operationgratitude.com    cblashek@aol.com
Tax ID: 20-0103575

ERIC L MEYEROWITZ ARCHITECT
4127 EAST SAN MIGUEL AVENUE  PHOENIX  AZ  85018
PH/F  310 739 3966   E  ERIC@ELMARCHITECT.COM


Hon. Ronnie Abrams
United States District Court
Southern District of New York
New York, N.Y.  1007

Dear Judge Abrams,

I am writing this letter on behalf of Jason Galanis.

I was shocked to hear that Jason has been in prison since September of 2016.  This is not the person I got to know a few years ago.  When I met Jason, I was the Operation Gratitude, Director of Production based out of Los Angeles, California.  Operation Gratitude is a non-profit organization that sends care packages to the men and women in the armed services overseas.  Jason was one of thousands of volunteers that I oversaw in the production of the care packages.  Just to give you an idea of the scale of this organization, Operation Gratitude was started soon after 9/11 and sent its one millionth care package in 2012. It continues to support the military today.

Jason quickly became a great asset to the cause.  He was hardworking and always had a positive attitude whenever he came to work, which was often, at the Van Nuys Armory, the former home base for the organization.  His dedication and willingness to perform any task, right down to hauling trash and weather protecting products exposed to the elements, quickly earned him respect from fellow volunteers and staff.  It wasn't long before he was asked to become a volunteer supervisor for the organization.  Accepting the role as a "blue shirt" meant taking on more responsibility within the organization, leading other volunteers to perform tasks and attending meetings in preparation for upcoming events.  Jason accepted this role wholeheartedly and became one of my "go to guys" when I needed something done.  He even learned how to drive a forklift to become more of an asset to the cause.  He exemplified the ideal volunteer primarily from his dedication to the organization and respect for the men and women we served.

If I may, please spare Jason any further time in prison.  He would be better off serving his community and helping others – a role I know he performs well and benefits from.  Jason Galanis deserves a second chance, one that I know he will embrace and appreciate for the rest of his life.

Thank you for your time and consideration,


Eric Meyerowitz, Architect
Operation Gratitude Director of Production, 2011 - 2013

Hon. Ronnie Abrams

United States District Court

Southern District of New York

New York, N. Y. 10007

Dear Judge Abrams:

My name is Robert A. Raskin and I am writing this letter on behalf of Jason Galanis in hopes that you will show leniency to him in his upcoming sentencing.

I have known Jason for about three plus years volunteering together for Operation Gratitude in Van Nuys, California, a nonprofit organization that sends care packages to our military both domestic and deployed including their families. Jason always brought to Operation Gratitude an attitude of generosity and kindness towards all who he met.

No activity was too heavy or too dirty for Jason, and he willingly volunteered to undertake any job requested of him.  Jason and his wife volunteered on many occasions on those days where the actual care packages were assembled.

One activity he really enjoyed was as a licensed Hi-Lift operator. We both received our licenses together and proudly cherished this achievement.

Jason was part of a group we called the "In-N-Out" lunch bunch where we all enjoyed a relaxed gathering of collegial banter amongst ourselves.


Respectfully yours,


Robert A. Raskin

Operation Gratitude Volunteer

Member of Board of Directors and its CFO

# Exhibit F

BP-A0324
JUN 10
**WORK PERFORMANCE RATING - INMATE**

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

| Inmate's Name<br>GALANIS, JASON | Register No.<br>80739-198 | Unit<br>5-NORTH* |
|---|---|---|
| Evaluation Period<br>January 2017 - PRESENT | Work Assignment<br>UNIT TUTOR (VOLUNTEER)* | |

Bonus Justification
**GALANIS has volunteered to facilitate several unit classes to his peers. He has good teaching skills & has made genuine effort to turn this negative experience into a positive one. He has played a significant role in encouraging his peers, & uses his time to help others achieve short-term goals academically. GALANIS faces challenges gracefully & is being recognized for his dedication.**

Signature and Date of Dept. Head Approval

Route to Dept. Head for Review, Then to Unit Team

Instructions: Check the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

**A. QUALITY OF WORK**
___1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
___2. Fair. Careless; makes mistakes and does not check work. Should do better work.
___3. Satisfactory. Makes some mistakes but no more than expected at this level.
___4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
_✓_5. Outstanding. Does superior work

**B. QUANTITY OF WORK**
___1. Unsatisfactory. Lazy, wastes time, goofs off.
___2. Fair. Does just enough to get by. Has to be prodded occasionally.
___3. Satisfactory. Works steadily but does not push self.
___4. Good. Willing Worker. Does a full day's work and wastes little time.
_✓_5. Outstanding. Drives self exceptionally hard all the time.

**C. INITIATIVE**
___1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
___2. Fair. Usually relies on others to say what needs to be done.
___3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
___4. Good. Can plan own work well. Acts on own in most things.  Doesn't wait to be told what to do.
_✓_5. Outstanding. Has good ideas on better ways of doing things.

**D. INTEREST; EAGERNESS TO LEARN**
___1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
___2. Fair. Shows minimal interest but not very eager to learn.
___3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
___4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
_✓_5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

**E. ABILITY TO LEARN**
___1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, no matter how hard trying.
___2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.
___3. Average. No slower and no faster to learn than most inmates.  Requires average amount of instruction.
___4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
_✓_5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT**
___1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
___2. Needs closer supervision than most. Not very dependable.
___3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
_✓_4. Needs little supervision. Good record of dependability an promptness.
___5. No supervision required. Completely dependable in all things.

Replaces BP-S324, OCT 94

**G. RESPONSE TO SUPERVISION AND INSTRUCTION**
___1. Poor. Resentful and hostile. May argue with supervisor.
___2. Fair. Resists or ignores suggestions.
___3. Satisfactory. Generally does what is told without any fuss.
___4. Good. No hostility or resentment. Tries to improve.
_✓_5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H. ABILITY TO WORK WITH OTHERS**
___1. Poor. Negativistic, hostile, annoying to others.
___2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
___3. Satisfactory. Gets along OK with most co-workers and is accepted by them.
___4. Good. Friendly, congenial, helpful; others like to work with.
_✓_5. Outstanding. Gets along well with everyone. Very popular.

**I. OVERALL JOB PROFICIENCY**
Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:

___1. Fire or lay off that individual?
___2. Transfer the person to a less demanding job at a lower pay scale?
___3. Continue to employ the person but without a raise or promotion this time?
___4. Raise the person's pay but keep the person at the same job?
_✓_5. Promote the person to a more demanding job at a higher pay rate?

**J. GRADES AND PAY**
1. Performance Pay - Grade Class (Check one) ___ 1   ___ 2   ___ 3   _✓_ 4   ___ M.

2. Hours of Satisfactory work _____ .

3. Regular Pay _____ .

4. Bonus Recommended: ___ yes; ___ no

5. Total Pay _____ .

| Supervisor's Signature<br>x: | Date<br>07/14/2017 |
|---|---|
| Inmate's Signature | Date<br>07/14/2017 |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

**SECTION 4**

AD      G EDUCATION

# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## JASON W. GALANIS, TUTOR

*for tutoring an extensive course of study in the Adult Continuing Education program*

## *BUSINESS ACUMEN*

### *April 6, 2017*

Lisa Rae Johnson
*Acting Supervisor of Education*
*Education Specialist*
*MCC New York Education Department*



COMPETENCE
PROFESSIONAL

TALENT

**ADULT CO**       **EDUCATION**

# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## JASON GALANIS

*for INSTRUCTING an extensive course of study in the Adult Continuing Education program*

## BUSINESS ACUMEN

### April 28, 2017

Lisa Rae Johnson
*Education Specialist*
*MCC New York Education Department*

COMPETENCE
PROFESSIONAL

TALENT

 

This certificate is awarded to

# JASON GALANIS

*for instructing the 20 hour Adult Continuing Education program*

## Entrepreneurship

*March 7, 2017*

L. R. Johnson
*Education Specialist*
**MCC New York Education Department**



# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## JASON GALANIS

*for INSTRUCTING an extensive course of study in the Adult Continuing Education program*

## *Entrepreneurship*

### *April 27, 2017*

L. R. Johnson
Education Specialist
MCC New York Education Department



# CERTIFICATE OF PARTICIPATION

*This certificate is awarded to*

# *JASON GALANIS*

*for your participation in the*

## *National African American Read In*

*February 28th, 2017*

A.   Delgado, Teacher
MCC New York Education Department

# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## JASON GALANIS

*for completion of an extensive course of study in the Adult Continuing Education program*

### A.C.E. Women's History

*May 28th, 2017*

A. Delgado, Teacher
MCC New York Education Department

# Exhibit G

Dear Judge Abrams:

I am writing this on behalf of Jason Galanis.
I have gotten to know Mr. Galanis during the last 15 months. While this may not seem like a long time, being in this environment allows a compressed view of a person's character. You could say that we live in a "fish bowl". The core of a person becomes plain. The response to this varies. Many embrace the environment, becoming more of what they were that led them to being incarcerated. Others, very few, take a hard look in the mirror and firmly decide that their "prior self" wasn't working and they try to change their appearance. Even fewer actually apply changes to the core of why they are. The smallest group does what they can to help others understand not just the need for change, but shares and guides them through the changes. More importantly, Mr. Galanis inspires the desire to change.
I have been a G.E.D tutor in the unit for the last 2 years, there is a huge difference between teaching math and inspiring people to want to learn math.

When Jason became a tutor, the effect his classes had on the unit were immediate and positive.
Capturing the attention of a multi-ethnic group of young men from the streets of New York is not easy. It is not Mr. Galanis's teaching style, but the earnestness and personal transparency he displayed that the young men responded to. You can't fool kids from the street with fancy words and being "fake".
Jason poured himself out to these kids, doing everything right and possibly not even knowing it. I make this statement not just as an observer, but based on conversations I have had with people Mr. Galanis has influenced. My work in the Chapel and as a leader of a bible study in the unit, I am privy to comments that would otherwise go unspoken. As I have mentioned before, offering information on how to change and inspiring the desire to change are very different. As a result, the atmosphere in the unit is vastly different as well.

I want to make it clear that nobody believes that being a great guy absolves you of your sins. We here in the feds live and eat accountability and personal responsibility breakfast, lunch and dinner. Not just to the Law, but to each other in our "fish bowl". However, I also believe that who we are before we make wrong decisions and who we are after we realize they were wrong, has bearing on how we reconcile the consequences.

I wanted to write this so that the reader would begin to get a sense of who Jason Galanis is becoming. I know very little of why Jason is here. I know nothing of who he was before he got here. I thought it important somebody say something about who Jason is today.

The transformative properties of incarceration falls on deaf ears most of the time. Recidivism rates show that. I can safely say that Jason Galanis is not deaf, quite the opposite. During conversations and teaching sessions, the one thought Jason Galanis pounds into the listener is that "We have an ethical responsibility beyond our own agenda. Failure to live up to this standard will land you right back in here." These are not the words of a man who has not responded positively to a thoughtful analysis of where he went wrong.
The way in which he delivers a much needed word of encouragement, or a deserved rebuke are done with the most positive of intentions. I do not want to bog the reader down with endless anecdotes, suffice it to say Jason has helped many in times of need.

It is said that "Our character is revealed by how we treat people who have no impact in our lives". I hope that by writing this, the character of Jason Galanis shows through. My greater hope is that by seeing Jason as a man of character and integrity you can see a man worthy of mercy.

Thank you for your time and attention.
God Bless
Michael Wattier

7-24-17

MY NAME is BENJAMIN FRANCIS and MR. GALANIS
helPed me with My Business concepts. He exPlained them in a way
that I understood.

He also advised me that caPital For Business is not just money.
It can be relationshiP caPital or knowledge caPital. This helPed
me think strongly about my Business opPortunities differently because
I was always worried about not having financial caPital at First.

MR. GALANIS Has made me realize that with general Business knowledge
and basic knowledge of Financial caPital. Also knowledge about
Basic Bookkeeping, Business Acumen, EntrePrenueshiP. That I will
have general knowledge and Intrest to Look into owning my own
Business or franchise or maybe even invest in one.

MR. GALANIS took the time out to sPeak to me After classes
and gave me great advice about a franchise that I'm considering
to persue upon my re-entry Back into society. He encouraged
me to call a Few contacts of mine in the Business field to
further my knowledge of Business.

I've met other white collar inmates who keeP to themselves or
seem selfish. MR. GALANIS is the totAl oPPosite. I know
his Life was different on the outside. He did not Bring any
attitude here.

I did not know what MR. GALANIS did until we read about in the Newpaper Here at MCC.

I ASK the COURTS to please have Mercy on MR. GALANIS.

7/22/2017

To whom this may concern, My name is
Maurice Thomas. I am currently being held
at MCC 5N. I have known Jason for
quiet some time. During this period of
time we have played chess and cards.
I find him to be someone easy to
talk to. He is a very generous person
who is always willing to give his but.
He is a very great tuter. Later on
down the line he became a teacher.
Which I graduated the class from
and recieved my certificate. I remem-
ber having trouble reaching out to
my lawyer and Jason solved that
problem by helping me write letters.
I pray and hope your honor show
some mercy, because he has a
big heart and has help a lot of us
through hard times. I find Jason
in this short period of time to
be a true friend. Thank you I
appreciate you taking this time to
read this letter.

From his true friend,
Maurice Thomas

Dear Hon. Judge Abrams,

Hey, my name is Maxamillion Mercado and im currently housed in Metropolitan Correctional Center (M.C.C). When I first me Jason Galanis, he seemed quiet coming into the unit. He then was placed in my cell due to me not having a bunkie. Later that night I had gave him a bite to eat cause I know how it is when you just coming into the building and you placed in R+D. We started making conversation and Jason still seemed shocked. Up in (M.C.C) its always like that. But he eventually broke the ice and we later became very good bunkies. Jason Galanis is very smart, respectful and would extend his hand to the less fortunate when ever he can. Everybody loves Jason. Not because he helps people, but simply because of his heart and personality. Being locked up is very stressful on a lot of us and we go through things we shouldint have to endure. And it may lead to things much greater. But as it seems, nothing was a match for Jason cause he was up to any task to keep everyone around him sain and comfortable. I learned a lot from Jason. Not to mention, he was teaching not only me, but the entire unit Business Acumen, Entreprenuership, Basic Bookeeping etc. Which contains a test at the end of each program to attain a certificate. Jason has been a positive romodel in my life and really made a difference. And by him teaching me the importance of business and networking, I find myself building my own business. Jason has been a friend and somebody that I can talk to about anything. Your honor, please find it in your heart that Jason gets ▓▓ the proper sentence he deserves. Thank You!

*Respectfully, Maxamillion Mercado

# Exhibit H



# MEMORANDUM

**To:**        Christopher Madiou, Esquire
              Attorney for Jason Galanis

**From:**      Meredith Patti, Esquire
              Mary Cate Rush, Chief Statistician

**Date:**      July 24, 2017

**Subject:**   FEDERAL SENTENCING DATA ANALYSIS (FSDA) FOR JASON GALANIS
              CRIMINAL HISTORY CATEGORY II USSG §2B1.1 DEFENDANTS
              JOINT PLEA AGREEMENT

---

Title 18 U.S.C. §3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. To this end, we were retained to prepare a data analysis to determine comparative sentences imposed on defendants most similar to Mr. Galanis.

*Mr. Galanis was offered a joint plea agreement which asked him to plead guilty to violating 18 USC § 371, 15 USC §78jb, 15 USC §78ff, 17 CFR §240.10b-5, 15 USC §80b-6 and 80b-17, and 18 USC §2. At the time of this offer, Mr. Galanis was a Criminal History Category II. According to this plea agreement, Mr. Galanis would have been scored according to USSG §2B1.1. It is our understanding that the loss attributable to Mr. Galanis was $80,869,117.10 and his Total Offense Level was 34 (168-210 months).*

## THE USSC DATABASE

The United States Sentencing Commission (USSC) maintains a comprehensive, computerized data collection system of federal sentencing information. Pursuant to 28 U.S.C. § 994(w) each chief judge of a district is required to ensure that within 30 days after entry of judgment in a criminal case the sentencing court submits a report of the sentence to the Commission that includes: (1) the judgment and commitment order; (2) the statement of reasons (including the reasons for any departures or variances); (3) any plea agreement; (4) the indictment or other charging document; (5) the presentence report; and (6) any other information the Commission needs.

4816 Twinbrook Rd. Fairfax VA 22032 ● office 703-971-0217 ● fax 703-539-1030
info@MCMDataConsulting.com

This collection contains information on federal criminal cases sentenced under the Sentencing Guidelines and Policy Statements of the Sentencing Reform Act of 1984. The data files included in this study contain all cases received by the USSC that were sentenced between October 1, 1998 and September 30, 2016. United States Federal Courts handled over 1.3 million criminal cases between the fiscal years 1999 and 2016. The USSC estimates that 99% of all cases are included in this dataset.

## DATA ANALYSIS

**STEP 1:**     For purposes of this analysis, we utilized the data sets for fiscal years 2002-2016 (see Step 3 for detailed explanation).

**STEP 2:**     Selected cases to include only those where the information related to a defendant's guideline calculation(s) represented known court findings. That is, only those cases where the court either agreed with the probation officer's calculations of the sentencing guidelines or where the court clearly documented any changes it made to a defendant's guideline calculation. Total cases = 984,278. (This represents approximately 87% of all cases.)

**STEP 3:**     Beginning in the November 2001 Guidelines Manual significant changes were made to USSG §2B1.1. Most notably, there were numerous changes made to the loss table in USSG §2B1.1(b)(1). In order to capture those cases most similar to the guideline under which Mr. Galanis would have been scored, we selected only those cases where the defendant was scored according to a 2001 or later Guidelines Manual. Further, we selected only those cases where the defendant's statutory guideline was USSG §2B1.1 and USSG §2B1.1 was used to calculate the defendant's guideline scoring.

> ➤ **890,603 cases Deleted**
> ➤ **93,675 cases Remain**

**STEP 4:**     At the time the plea was offered, Mr. Galanis was a Criminal History Category II. Deleted those cases where the defendant was not a Criminal History II.

> ➤ **85,308 cases Deleted**
> ➤ **8,367 cases Remain**

**STEP 5:**     Deleted those cases where the defendant was convicted after trial.

> ➢ **301 cases Deleted**
> ➢ **8,066 cases Remain**

**STEP 6:**     Examined each case to determine if it contained missing or incomplete sentencing information.  Deleted those cases that contained missing or incomplete sentencing information.

> ➢ **5 cases Deleted**
> ➢ **8,061 cases Remain**

**STEP 7:**     Examined each case to determine if it contained missing or incomplete loss information.  Deleted those cases that contained missing or incomplete loss information.

> ➢ **6 cases Deleted**
> ➢ **8,055 cases Remain**

**STEP 8:**     It is our understanding that Mr. Galanis would <u>not</u> have received a substantial assistance downward departure pursuant to USSG §5K1.1. Deleted those cases where the defendant received a downward departure pursuant to USSG §5K1.1.

> ➢ **987 cases Deleted**
> ➢ **7,068 cases Remain**

**STEP 9:**     For these 7,068 cases, calculated how many defendants were sentenced to a term of imprisonment versus those receiving a probationary/fine only sentence or a sentence of time served and determined the average sentence imposed for each loss category (see Table A).[1]

---

[1] Sentences of probation are included in this calculation as zero months of imprisonment.

## FINDINGS - NATIONAL

| Table A<br>**Guilty Pleading, Criminal History Category II Defendants**<br>**Scored According to USSG §2B1.1**<br>**(Excludes USSG §5K1.1 Defendants)**<br>**National - FY 2002-2016** | | | | | |
|---|---|---|---|---|---|
| **Level Increase for Loss Amount** | **Total Cases** | **Probation/ Fine Only** | **Prison** | **Time Served[2]** | **Average Sentence[3]** |
| **0-16** | **n=6,867** | **2,265 (33.0%)** | **4,523 (65.9%)** | **79 (1.2%)** | **13.8 MO** |
| **18** | **n=122** | **1 (0.8%)** | **121 (99.2%)** | **0 (0.0%)** | **76.6 MO** |
| **20** | **n=51** | **0 (0.0%)** | **51 (100.0%)** | **0 (0.0%)** | **99.7 MO** |
| **22** | **n=12** | **0 (0.0%)** | **12 (100.0%)** | **0 (0.0%)** | **124.0 MO** |
| **24** | **n=7** | **0 (0.0%)** | **7 (100.0%)** | **0 (0.0%)** | **113.0 MO** |
| **26** | **n=6** | **0 (0.0%)** | **6 (100.0%)** | **0 (0.0%)** | **189.7 MO** |
| **28 and Over** | **n=3** | **1 (33.3%)** | **2 (66.7%)** | **0 (0.0%)** | **120.0 MO** |
| **All Cases** | **n=7,068** | **2,267 (32.1%)** | **4,722 (66.8%)** | **79 (1.1%)** | **16.0 MO** |

Note:  Percentages may not equal 100% due to rounding.

- As shown in Table A, there were 7 defendants who received a 24-level increase for loss. All 7 of these defendants were sentenced to a term of imprisonment and the average sentence imposed was 113.0 months of imprisonment.

---

[2] The defendants in this category are those sentenced to Time Served where the precise amount of time they served is unknown.

[3] For purposes of this calculation, those defendants described in Footnote 2 are excluded because the precise amount of time they served is unknown.  Therefore, these defendants cannot be included in the calculation of an average sentence.

- For the 7 defendants who received a 24-level increase for loss, we tallied the total number of cases where the defendant received a sentence below the applicable guideline range, within the applicable guideline range, or above the applicable guideline range. Table B illustrates these findings.

| Table B<br>Guilty Pleading, Criminal History Category II Defendants<br>Scored According to USSG §2B1.1<br>(Excludes USSG §5K1.1 Defendants)<br>24-Level Increase for Loss<br>National - FY 2002-2016 | | |
|---|---|---|
| **Category** | **No. of Cases** | **Percentage** |
| Below Guideline Range | 5 | 71.4% |
| Within Guideline Range | 2 | 28.6% |
| Above Guideline Range | 0 | N/A |
| **Total** | **7** | **100.0%** |

- For the 5 defendants who received a sentence below the advisory guideline range, courts departed on average 143.2 months below the guideline minimum.

- None of the 7 defendants who received a 24-level increase for loss had a **Total Offense Level of 34**.

- Of the 7 defendants who received a 24-level increase for loss, 6 of these defendants were sentenced **post-*Kimbrough***.[4]   All 6 of these defendants were sentenced to a term of imprisonment and the average sentence imposed was 100.5 months of imprisonment.

- For the 6 defendants sentenced post-*Kimbrough* who received a 24-level increase for loss, we tallied the total number of cases where the defendant received a sentence below

---

[4] In *Gall v. United States*, 522 U.S. 38 (2007) and *Kimbrough v. United States*, 522 U.S. 85 (2007), the Supreme Court made clear that district court judges have substantial discretion to impose non-Guidelines sentences and need not find "extraordinary circumstances" to justify a sentence outside the Guidelines range. The Supreme Court also stated that a court of appeals may not apply a presumption of unreasonableness to a non-Guidelines sentence, and instead must give "due deference" to the sentencing judge's analysis of the 18 USC § 3553(a) factors. Defendants sentenced after the Supreme Court's decisions in *Gall* and *Kimbrough* were isolated so that only those defendants sentenced according to this guidance from the Supreme Court could be analyzed.

the applicable guideline range, within the applicable guideline range, or above the applicable guideline range.  Table C illustrates these findings.

| Table C | | |
| --- | --- | --- |
| **Guilty Pleading, Criminal History Category II Defendants Scored According to USSG §2B1.1 (Excludes USSG §5K1.1 Defendants) 24-Level Increase for Loss National – post-*Kimbrough*** | | |
| **Category** | **No. of Cases** | **Percentage** |
| Below Guideline Range | 5 | 83.3% |
| Within Guideline Range | 1 | 16.7% |
| Above Guideline Range | 0 | N/A |
| **Total** | **6** | **100.0%** |

- For the 5 defendants who received a sentence below the advisory guideline range, courts departed on average 143.2 months below the guideline minimum.

**FINDINGS – SECOND CIRCUIT**

- Of the 7 defendants who received a 24-level increase for loss, 2 defendants were sentenced in the **Second Circuit**.  Both of these defendants were sentenced to a term of imprisonment and the average sentence imposed was 130.0 months of imprisonment.  Both of these defendants were sentenced below their guideline range.  Specifically, both of these defendants had a Total Offense Level of 37 and had a guideline range of 235-293 months of imprisonment.  Both of these defendants were sentenced post-*Kimbrough*.

- Both of these defendants were sentenced in the **Southern District of New York**.

# Exhibit I



# MEMORANDUM

**To:**        Christopher Madiou, Esquire
              Attorney for Jason Galanis

**From:**      Meredith Patti, Esquire
              Mary Cate Rush, Chief Statistician

**Date:**      July 24, 2017

**Subject:**   FEDERAL SENTENCING DATA ANALYSIS (FSDA) FOR JASON GALANIS
              CRIMINAL HISTORY CATEGORY III USSG §2B1.1 DEFENDANTS

---

Title 18 U.S.C. §3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. To this end, we were retained to prepare a data analysis to determine comparative sentences imposed on defendants most similar to Mr. Galanis.

*Mr. Galanis pleaded guilty to violating 18 USC § 371, 15 USC §78jb, 15 USC §78ff and 17 CFR §240.10b-5 and will be sentenced in United States District Court for the Southern District of New York. Mr. Galanis is a Criminal History Category III and is scored according to USSG §2B1.1. It is our understanding that the loss attributable to Mr. Galanis is $43,277,436. According to Mr. Galanis's Presentence Investigation Report his Total Offense Level is 34 (188-235 months).*

## THE USSC DATABASE

The United States Sentencing Commission (USSC) maintains a comprehensive, computerized data collection system of federal sentencing information. Pursuant to 28 U.S.C. § 994(w) each chief judge of a district is required to ensure that within 30 days after entry of judgment in a criminal case the sentencing court submits a report of the sentence to the Commission that includes: (1) the judgment and commitment order; (2) the statement of reasons (including the reasons for any departures or variances); (3) any plea agreement; (4) the indictment or other charging document; (5) the presentence report; and (6) any other information the Commission needs.

4816 Twinbrook Rd. Fairfax VA 22032 ● office 703-971-0217 ● fax 703-539-1030
info@MCMDataConsulting.com

This collection contains information on federal criminal cases sentenced under the Sentencing Guidelines and Policy Statements of the Sentencing Reform Act of 1984. The data files included in this study contain all cases received by the USSC that were sentenced between October 1, 1998 and September 30, 2016. United States Federal Courts handled over 1.3 million criminal cases between the fiscal years 1999 and 2016. The USSC estimates that 99% of all cases are included in this dataset.

## DATA ANALYSIS

**STEP 1:**   For purposes of this analysis, we utilized the data sets for fiscal years 2002-2016 (see Step 3 for detailed explanation).

**STEP 2:**   Selected cases to include only those where the information related to a defendant's guideline calculation(s) represented known court findings. That is, only those cases where the court either agreed with the probation officer's calculations of the sentencing guidelines or where the court clearly documented any changes it made to a defendant's guideline calculation. Total cases = 984,278. (This represents approximately 87% of all cases.)

**STEP 3:**   Beginning in the November 2001 Guidelines Manual significant changes were made to USSG §2B1.1. Most notably, there were numerous changes made to the loss table in USSG §2B1.1(b)(1). In order to capture those cases most similar to the guideline under which Mr. Galanis is scored, we selected only those cases where the defendant was scored according to a 2001 or later Guidelines Manual. Further, we selected only those cases where the defendant's statutory guideline was USSG §2B1.1 and USSG §2B1.1 was used to calculate the defendant's guideline scoring.

> ➢ **890,603 cases Deleted**
> ➢ **93,675 cases Remain**

**STEP 4:**   According to his Presentence Investigation Report, Mr. Galanis is a Criminal History Category III. Deleted those cases where the defendant was not a Criminal History III.

> ➢ **84,878 cases Deleted**
> ➢ **8,797 cases Remain**

**STEP 5:**   Mr. Galanis entered into a plea agreement.  Deleted those cases where the defendant was convicted after trial.

> ➢ **228 cases Deleted**
> ➢ **8,569 cases Remain**

**STEP 6:**   Examined each case to determine if it contained missing or incomplete sentencing information.  Deleted those cases that contained missing or incomplete sentencing information.

> ➢ **8 cases Deleted**
> ➢ **8,561 cases Remain**

**STEP 7:**   Examined each case to determine if it contained missing or incomplete loss information.   Deleted those cases that contained missing or incomplete loss information.

> ➢ **4 cases Deleted**
> ➢ **8,557 cases Remain**

**STEP 8:**   It is our understanding that Mr. Galanis will <u>not</u> receive a substantial assistance downward departure pursuant to USSG §5K1.1. Deleted those cases where the defendant received a downward departure pursuant to USSG §5K1.1.

> ➢ **1,037 cases Deleted**
> ➢ **7,520 cases Remain**

**STEP 9:**   For these 7,520 cases, calculated how many defendants were sentenced to a term of imprisonment versus those receiving a probationary/fine only sentence or a sentence of time served and determined the average sentence imposed for each loss category (see Table A).[1]

---

[1] Sentences of probation are included in this calculation as zero months of imprisonment.

**FINDINGS - NATIONAL**

| Table A<br>**Guilty Pleading, Criminal History Category III Defendants<br>Scored According to USSG §2B1.1<br>(Excludes USSG §5K1.1 Defendants)<br>National - FY 2002-2016** | | | | | |
|---|---|---|---|---|---|
| **Level Increase for Loss Amount** | **Total Cases** | **Probation/ Fine Only** | **Prison** | **Time Served[2]** | **Average Sentence[3]** |
| 0-16 | n=7,390 | 1,717 (23.2%) | 5,580 (75.5%) | 93 (1.3%) | 17.6 MO |
| 18 | n=79 | 1 (1.3%) | 78 (98.7%) | 0 (0.0%) | 86.8 MO |
| 20 | n=38 | 1 (2.6%) | 37 (97.4%) | 0 (0.0%) | 138.4 MO |
| 22 | n=8 | 0 (0.0%) | 8 (100.0%) | 0 (0.0%) | 144.9 MO |
| 24 | n=3 | 0 (0.0%) | 3 (100.0%) | 0 (0.0%) | 81.0 MO |
| 26 | n=0 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | N/A |
| 28 and Over | n=2 | 0 (0.0%) | 2 (100.0%) | 0 (0.0%) | 71.0 MO |
| All Cases | n=7,520 | 1,719 (22.9%) | 5,708 (75.9%) | 93 (1.2%) | 19.2 MO |

Note:  Percentages may not equal 100% due to rounding.

- As shown in Table A, there were 8 defendants who received a 22-level increase for loss. All 8 of these defendants were sentenced to a term of imprisonment and the average sentence imposed was 144.9 months of imprisonment.

---

[2] The defendants in this category are those sentenced to Time Served where the precise amount of time they served is unknown.

[3] For purposes of this calculation, those defendants described in Footnote 2 are excluded because the precise amount of time they served is unknown.  Therefore, these defendants cannot be included in the calculation of an average sentence.

- For the 8 defendants who received a 22-level increase for loss, we tallied the total number of cases where the defendant received a sentence below the applicable guideline range, within the applicable guideline range, or above the applicable guideline range. Table B illustrates these findings.

| Table B<br>Guilty Pleading, Criminal History Category III Defendants<br>Scored According to USSG §2B1.1<br>(Excludes USSG §5K1.1 Defendants)<br>22-Level Increase for Loss<br>National - FY 2002-2016 | | |
|---|---|---|
| **Category** | **No. of Cases** | **Percentage** |
| Below Guideline Range | 5 | 62.5% |
| Within Guideline Range | 3 | 37.5% |
| Above Guideline Range | 0 | N/A |
| **Total** | **8** | **100.0%** |

- For the 5 defendants who received a sentence below the advisory guideline range, courts departed on average 92.2 months below the guideline minimum.

- All 8 of the defendants who received a 22-level increase for loss were sentenced **post-Kimbrough**.

- None of the 8 of the defendants who received a 22-level increase for loss had a **Total Offense Level of 34**.


FINDINGS – SECOND CIRCUIT

- None of the 8 defendants who received a 22-level increase for loss were sentenced in the Second Circuit.

Exhibit J

## EXHIBIT A

### Statement of Investment Objectives

The Corporation in order to build an endowment pool of capital dedicated to sustaining economic development of the tribal members has determined that the current low interest rate environment provides the opportunity to borrow at a relatively low rate of interest. The Corporation has been able to borrow funds, which it wishes to invest utilizing a private equity strategy that has a historically higher rate of return.  In order to reduce the risk that some interim event might result in a disruption of payments on the funds necessary to make payment on the Corporation's borrowing the Manager is instructed to purchase a variable annuity which will provide for sufficient cash flow to service the debt plus an amount to meet other current obligations of the tribe (estimated to be $250,000.00 per annum).

We are value-oriented investors, and would suggest the Manager invest in situations that may be overlooked by others, including in companies suffering from capital markets dislocation, financial distress, complexity or negative market sentiment. To secure the best investments, the manager is to take a flexible approach to sourcing and structuring investments, and be involved in multifaceted transactions (including investments through the bankruptcy process).   The manager whenever possible will give preference to investments in the financial services sector.

# Exhibit K



August 25, 2014

Wakpamni Lake Community Corporation
Batesland, SD

U.S. Bank National Association
Phoenix, AZ

Dilworth Paxson
Philadelphia, PA

Re:    Wakpamni Lake Community Corporation
       $24,844,089 Special Limited Revenue Bonds (Taxable) Series of 2014 (Economic
       Development Program)

Ladies and Gentlemen:

Wakpamni Lake Community Corporation (the "Issuer") has authorized and issued its $24,844,089 Special Limited Revenue Bonds (Taxable) Series of 2014 (Economic Development Program) dated August 25, 2014 (the "Bonds"), pursuant to the provisions of a Trust Indenture dated as of August 25, 2014 by and between the Issuer and U.S. Bank National Association ("Indenture"), and Resolution No. 14-001 ("Resolution") of the Board of Directors of the Issuer ("Board") adopted on August 8, 2014 and Resolution No. 14-007 of the Board adopted on August 8, 2014 ("Resolution Regarding Limited Waiver of Sovereign Immunity," and together with the Resolution, the "Resolutions"). The Bonds are being privately placed by Burnham Securities, Inc. ("Placement Agent") to accredited investors, as defined and set forth in the Indenture, pursuant to a Placement Agency Agreement dated August 8, 2014 by and between the Issuer and the Placement Agent ("Placement Agency Agreement"). Proceeds from the sale of the Bonds are to be used to finance: (i) the purchase of an Annuity Contract; (ii) the Junction 18 Development, and (iii) pay costs of issuance of the Bonds (collectively, the "Project"). Capitalized terms used, but not defined herein, shall have their respective meanings as set forth in the Indenture.

As counsel to the Issuer, we have examined and are familiar with the books, records and files of the Issuer, the executed Bonds, the Resolution, the Indenture, the Placement Agency Agreement, and such other documents (collectively, the "Documents") and information as we have considered pertinent, and based upon our review of the aforementioned, we are of the opinion as follows:

1.     The Issuer is a duly-organized subsidiary corporation of the Wakpamni Lake Community, and an economic arm and instrumentality of the Wakpamni Lake Community, a subordinate governmental unit of the Oglala Sioux Tribe. The Oglala Sioux Tribe is organized in accordance with Section 16 of the Indian Reorganization Act of 1934 and

DEN 98600228v1

Wakpamni Lake Community Development Corporation
U.S. Bank National Association
Dilworth Paxson
August 25, 2014
Page 2

pursuant to the Tribe's federally-approved Constitution and Bylaws. The Issuer is validly existing and in good standing under applicable Tribal law, including Article VI of the Oglala Sioux Tribe Constitution and Bylaws; Resolution 78-101 passed by the Oglala Sioux Tribal Council on January 23, 1978; and Resolutions passed by the Wakpamni Lake Community on March 4, 2012 and by the Issuer on August 8, 2014.

2.    The Issuer has the authority pursuant to the Tribal laws referenced in Paragraph 1 above, and pursuant to Issuer's Articles of Incorporation, Paragraphs 3.2, 3.3., and Articles V and VI and particularly Paragraph 7.23, and the Resolution Regarding Limited Waiver of Sovereign Immunity, to: (i) adopt the Resolution; (ii) execute, deliver and perform its obligations under the Resolution, the Indenture and the Placement Agency Agreement; (iii) issue, sell and deliver the Bonds; and (iv) carry out and consummate all other transactions contemplated by the Documents.

3.    The Bonds have been duly authorized, executed and delivered and constitute the legal, valid and binding limited obligation of the Issuer payable solely from the Pledged Revenue, enforceable against the Issuer in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganizations, readjustment of debt, moratorium or other laws, judicial decisions, or principals of equity relating to or affecting the enforcement of creditor's rights or contractual obligations, generally. The Bonds and the interest thereon do not constitute a general obligation or indebtedness of the Issuer within the purview of any constitutional provision or statutory limitation, or a charge against the general credit or taxing powers, if any.

4.    The Bonds, the Indenture and the Placement Agent Agreement have each been duly authorized, executed and delivered and each constitutes a legal, valid and binding obligation of the Issuer in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, readjustment of debt, moratorium or other laws, judicial decisions, or principals of equity relating to or affecting the enforcement of creditor's rights or contractual obligations, generally.

5.    The Issuer has taken all of the actions necessary to duly authorize the issuance and sale of the Bonds and to authorize the transactions contemplated by the Documents. No other approval, consent or order of any governmental authority, municipal corporation, agency or commission having jurisdiction, which would constitute a condition precedent to the performance by the Issuer of its obligations under the Documents, are required to be obtained before the execution and delivery of the foregoing instruments, or before the foregoing instruments shall be in full force and effect.

6.    To our knowledge, based solely on a certificate of authorized officers of the Issuer, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, pending or threatened against Issuer in any court, entity, agency, tribunal, or board, affecting the corporate existence of Issuer, the titles of its officers or their respective offices which

Wakpamni Lake Community Development Corporation
U.S. Bank National Association
Dilworth Paxson
August 25, 2014
Page 3

otherwise seeks to prohibit, restrain or enjoin the issuance, sale or delivery of the Bonds, or questioning or affecting the validity or enforceability of the Documents, or the transactions contemplated thereby, or the powers or authority of the Issuer to issue the Bonds, adopt the Resolution, or to perform its obligations under the Documents.

7.      To the best of our knowledge, based solely on a certificate of authorized officers of the Issuer, the Issuer is not in breach of, or in default under, any existing law, court decree or order, administrative regulation, ordinance, resolution, agreement, indenture, or other instrument to which the Issuer is a party or by which the Issuer or its property is or may be bound, and no event has occurred or is continuing that, with the passage of time or giving of notice, or both, would constitute a default or an event of default thereunder, in either case, in any manner or to any extent that could have an adverse effect on the validity or enforceability in accordance with the respective terms of the Documents or in any way adversely affect the existence or powers of the Issuer.

8.      The proceedings taken by the Board of Directors of the Issuer in authorizing and issuing the Bonds and applying the proceeds thereof as provided in the Resolution and the Indenture, and the execution, delivery and performances by the Issuer under the Bond are within its powers, and will not conflict with or constitute, on behalf of Issuer, a breach of, any law, court decree or order, administrative regulation, ordinance, resolution, agreement, indenture or any other instrument to which the Issuer or its property is bound.

9.      Each of the Resolutions is in full force and effect according to the terms thereof and has not been amended, modified or supplemented, and was duly adopted, approved and authorized by the Board in strict compliance with all of the provisions of applicable Tribal law.

The foregoing opinions are further subject to the following qualifications:

(i)      We are licensed to practice law in the State of South Dakota and in the jurisdiction of the Oglala Sioux Tribe, and we express no opinion concerning any law other than the law of the State of South Dakota, the law of the Oglala Sioux Tribe and applicable federal laws.

(ii)      We express no opinion as to the effect of the compliance or non-compliance by any party other than the Issuer with any state or federal laws or regulations applicable because of the legal or regulatory status of such party, or because of the nature of the business of such party or because of such party's participation in the transactions contemplated in any of the Documents.

(iii)      The opinions expressed herein are based upon an interpretation of, and are limited to, existing laws, ordinances and regulations, which laws are subject to change at any time by legislation, administrative action or judicial decision.

*DEN 98600228v1*

Wakpamni Lake Community Development Corporation
U.S. Bank National Association
Dilworth Paxson
August 25, 2014
Page 4

We render this opinion to the parties named above and it may not be relied upon in any manner by any other person or entity without our prior written consent. This opinion is limited to the matters stated herein and no opinion may be implied or inferred beyond the matters expressly stated. This opinion is an expression of our professional judgment and is not a guarantee of any result. This opinion is given as of its dates and we assume no obligation to advise of changes that may later be brought to our attention

Yours truly,

Greenberg Traurig LLP

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM

# Exhibit L

**VALOR GROUP, LTD.**
**Balance Sheet**
**As of December 31, 2014 and 2013**

### Liabilities and Stockholders' Equity

|  | 2014 | 2013 |
|---|---|---|
| **Current Liabilities** | | |
| ACCOUNTS PAYABLE | $ 74,343,595.00 | $ 65,221,757.00 |
| ACCRUED EXPENSES | 34,548,881.59 | 7,861,716.00 |
| SOCIAL SECURITY LIABILITY | 47,767.61 | 18,608.00 |
| TAX LIABILITY | 269,366.00 | 94,242.00 |
| TAX PROVISIONS | 660,956.78 | 1,344.00 |
| OTHER PROVISIONS | 7,383,968.67 | 1,193,423.00 |
| ACCRUALS AND DEFERRALS | 1,024,817.27 | 233,796.00 |
| DEFERRED PAYMENTS | 5,031,750.00 | 0.00 |
| ACTUARIAL RESERVE | 812,905.25 | 365,881.00 |
| TECHNICAL RESERVCE | 4,314,561,176.94 | 0.00 |
| **Total Current Liabilities** | 4,438,685,185.11 | 74,990,767.00 |
| **Long-Term Liabilities** | | |
| LOAN PAYABLE - THORSDALE | 13,419,837.23 | 0.00 |
| LOAN PAYABLE - DIRECTORS | 1,575,000.00 | 0.00 |
| LOAN PAYABLE - ICA | 659,980.27 | 0.00 |
| INVESTMENT RISK ON LIFE INSURANCE | 989,254,367.00 | 1,293,613,503.00 |
| **Total Long-Term Liabilities** | 1,004,909,184.50 | 1,293,613,503.00 |
| **Total Liabilities** | 5,443,594,369.61 | 1,368,604,270.00 |
| **Stockholders' Equity** | | |
| COMMON STOCK - CLASS A | 1,100.00 | 1,100.00 |
| COMMON STOCK - CLASS B | 2,500.00 | 2,500.00 |
| PAID IN CAPITAL | 14,997,500.00 | 14,997,500.00 |
| EQUITY | 74,968,095.38 | (1,769,304.00) |
| NONCONTROLLING INTEREST IN SUBSIDIARIES | (7,899,196.00) | (7,337,181.00) |
| CURRENT NET INCOME-LOSS | 177,482,895.84 | 61,611,443.00 |
| **Total Stockholders' Equity** | 259,552,895.22 | 67,506,058.00 |
| **Total Liabilities and Stockholders' Equity** | $ 5,703,147,264.83 | $ 1,436,110,328.00 |