UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 16 Cr. 371 (RA)

JOHN GALANIS, et al.,

Defendants.

------------------------------x

New York, N.Y.
May 22, 2018
9:30 a.m.

Before:

HON. RONNIE ABRAMS,

District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: BRENDAN FRANCIS QUIGLEY
REBECCA GABRIELLE MERMELSTEIN
NEGAR TEKEEI
Assistant United States Attorneys

PELUSO & TOUGER
Attorneys for Defendant John Galanis
BY: DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
Attorneys for Defendant Devon Archer
BY: MATTHEW LANE SCHWARTZ
LAURA HARRIS

Appearances (Cont'd)

PAULA JACLYN NOTARI
Attorney for Defendant Bevan Cooney
- and -
O'NEILL and HASSEN
Attorneys for Defendant Bevan Cooney
BY: ABRAHAM JABIR ABEGAZ-HASSEN

Also present: Kendall Jackson, Paralegal
Ellie Sheinwald, Paralegal
Eric Wissman, Paralegal
Special Agent Shannon Bienick, FBI

(In open court)

THE COURT: Good morning, everyone. You can be seated.

I understand are we still waiting for Mr. Touger?

MR. SCHWARTZ: That's correct.

MS. NOTARI: Your Honor, Mr. Cooney needs to be arraigned.

Do you want to do that?

THE COURT: Yes. Why don't we do that.

Mr. Cooney, can you please stand.

Have you seen a copy of the superseding indictment?

DEFENDANT COONEY: I have.

THE COURT: Have you reviewed it with your attorney?

DEFENDANT COONEY: I have, your Honor.

THE COURT: Would you like me to read it out loud, or do you waive its public reading?

DEFENDANT COONEY: I waive, your Honor.

THE COURT: How do you plead to the charges?

DEFENDANT COONEY: Not guilty, your Honor.

THE COURT: Thank you. You may be seated.

Good morning, Mr. Touger.

MR. TOUGER: Good morning, your Honor.

I waive my client's appearance.

THE COURT: I have a few things that I want to raise. I know there a number of evidentiary issues that the parties

would like rulings on before opening so we'll plan to meet tomorrow morning.

There are a few things I want to talk about today. One, I just want to remind you that with respect to the 12-person jury, the defendants will collectively have 12 peremptories and the government will have six all of which will be made simultaneously. You will first be exercising your challenges with respect to the first 30 prospective jurors all of whom we'll have questioned. Each side will also get two peremptories for the four alternates. Those challenges will be made to the separate pool of Prospective Jurors 31 through 38.

Is everyone clear and does anyone have any questions about the voir dire process?

Finally, I noticed that Joe Biden is on the list of people who may be mentioned at trial, and I know there is a pending motion with respect to the admissibility of the Cooney-Crafton recording in which there is a reference to the fact that Mr. Archer has worked with Mr. Hunter Biden. Just for purposes of voir dire, that is the one name I think will come up the most often -- yes?

MR. SCHWARTZ: Sorry.

THE COURT: I was going to say if people say, Yes, I know who Joe Biden is, should I say anything such as the fact that Mr. Archer was business partners with Mr. Biden's son?

MR. SCHWARTZ: I think that in the first instance we

should simply ask what the juror's feelings are about Mr. Biden, whether they have any strongly held feelings. If the answer is yes, we can do appropriate follow-up at side bar.

To the clear the reason why I stood up quickly is there is going to be a lot more than than just that recording that makes reference to Mr. Joe Biden and Hunter Biden throughout this trial.

THE COURT: Joe as well?

MR. SCHWARTZ: Yes. John Kerry is on that list. That will be a real issue throughout this trial.

MR. QUIGLEY: Judge, without commenting on this, reserving any objection to relevance of any such evidence, I would agree with Mr. Schwartz in that the jury should be questioned as to whether they have any strong feelings about Mr. Biden or Mr. Kerry. I don't think it will be appropriate for your Honor to comment that Mr. Biden -- Hunter Biden was business partners with Mr. Archer's son. That is a fact that may or may not come into evidence.

THE COURT: I don't need to mention that. I just want the jurors to know that this case is not about politics, and I don't want anyone thinking that their political views of Joe Biden or John Kerry are at all relevant. I want to be able to cut that off. I am thinking of what I can tell them that everyone feels confident is appropriately going to be heard at the trial that can give the jurors some context.

MR. QUIGLEY: I think you can say exactly that, your Honor, that this case is not about politics, that these names may come up, but your political views are irrelevant to your duty as jurors and you are supposed to make a decision on the facts and the evidence presented.

MR. SCHWARTZ: I certainly have no objection to the last part of that, which is that the jurors should make their decision based on the facts that are before them and the evidence; but in a case where there is going to be even in the government's own exhibits substantial evidence of Mr. Archer's connections to the Biden and Kerry families, I think it is appropriate to explore that. If your Honor wants to say something in order to cut off any concerns about general political litmus tests to say, Would it affect your thinking if one of the defendants had a personal or business relationship with Mr. Biden or Mr. Kerry's families, I think that will be fine. Again, I will suggest only if you first get a positive response to the more generic question.

MR. SCHWARTZ: To go back to one thing your Honor said. I understand that you're reserving decision on some of these evidentiary issues for openings before tomorrow.

THE COURT: Yes.

MR. SCHWARTZ: The recording just because of the technical setup that that will be involved would benefit from an earlier ruling. It doesn't have to done now, but if we can

have the evening to make sure that the tech is correct, that will be very helpful.

THE COURT: You weren't going to play a recording in opening anyway. It will not be in evidence. Even if I were to say it is appropriately brought in, you are going to say what you expect the evidence to show, but a particular exhibit whether it is a recording or a document is not yet in evidence and I don't think it is appropriate for you to show it to the jury in opening.

MR. SCHWARTZ: I understand that and I think and I had a conversation with the government about this in advance that both of us were intending to show exhibits or portions of exhibits that we expect will come in without objection. We're going to share that with one another in advance.

MR. QUIGLEY: That is incorrect, your Honor. We had some discussion with Mr. Schwartz a week or two ago about if we are going to show any demonstratives, charts or anything like that, we would exchange in advance. It was not about exhibits, and I can represent that the government does not intend to show any demonstratives or exhibits during opening. We agree with your Honor it will be inappropriate to play a document that is not in evidence during opening.

MR. SCHWARTZ: That is fine. They are not going to have any visuals with their opening that, is fine. I thought I saw in their papers and among other things, that they wanted to

use mugshots in opening and that would be exhibits.

MR. QUIGLEY: No, your Honor. I think we said jury addresses and politics would not be referred to in closings or rebuttal in the PowerPoint.

THE COURT: So we're all on the same page.

Are there any other issues you would like to raise now?

MR. TOUGER: One, your Honor.

I understand there is a Wi-Fi issue and we cannot get it. We're going to need a copy of that at the defense table because otherwise Mr. Galanis will never be able to see any of the exhibits that are going in.

THE COURT: What is "that," the government exhibits?

MR. TOUGER: The folders.

THE COURT: Weren't you advised of each of the exhibits?

MR. TOUGER: I have them.

THE COURT: You just didn't bring for your client to see?

MR. TOUGER: He has seen them through a computer. I haven't printed all them out, your Honor. I haven't done that. If that is what the Court wants me to do, I will waste CJA's money doing. I haven't printed them all out. They gave them to me to print out.

THE COURT: Do you have access to your lap top so you

can pull it up?

MR. TOUGER: If we don't have Wi-Fi, we don't.

THE COURT: All right.

MR. TOUGER: It would be a lot cheaper. I understand there is some type of court Wi-Fi we can get rather than printing out the documents in this case. It would take me forever to get them.

THE COURT: I think there are court policies with respect to Wi-Fi. There is a company called Courtroom Connect, but this is something you have to work out with the D.E.'S office. I think some of the lawyers have already asked about this. So Courtroom Connect works with the courthouse A/V department. So you can work with them. If not, I think my law clerk and I both have copies and we're happy to share them with you. If you make your own --

MR. TOUGER: I can print them out.

THE COURT: Why don't you look into Courtroom Connect. Try not to save things for the day of trial.

MR. TOUGER: I never started trial where the government hasn't given me a book of exhibits. I am shocked that I don't have them.

THE COURT: In any event, I am sure we're happy to share with you. In the meantime you should try to figure out if you are going to use Courtroom Connect.

MS. NOTARI: Your Honor.

THE COURT: Sure.

MS. NOTARI: So there has been going back and forth about when the government is to give us their exhibits for each witness. So part of the problem is that a lot of 3500 documents have -- there is voluminous amounts -- have tab numbers. When they interview witnesses within these documents, they would reference tab numbers and Bates stamp numbers. Those were not in the government exhibit numbers. So in our preparation, we don't know. If I want to approach a witness with a document, it doesn't have a government exhibit number.

What we're asking for and what we have been asking for for a while is if the Friday before when they give us the notice of next week's witnesses if they also let us know which exhibits they will be referencing. Otherwise, it is going to be very time-consuming and confusing for everyone because we're not really going to who what these people previewed and what issues we need to focus on.

MR. QUIGLEY: Judge, we made a proposal last night that I think the ball is still in the defendants' court on. It is similar to the practice that was followed in the Silver retrial before Judge Caproni, which as I understand it was one of the factors, amongst several, that resulted in that trial going from I think over a month the first time around to about two weeks the second time around, and that is that 48 hours before the witness is testifying, for example, if the witness

is testifying on a Wednesday, we would produce at the close of the trial day on Monday a list of the exhibits we intend to offer through that witness.

THE COURT: Not quite 48 hours.

MR. QUIGLEY: Yes.

THE COURT: They will have two evenings?

MR. QUIGLEY: Two evenings. At the same time -- I think what is good for the goose is good for the gander -- to the extent the defense plans to introduce a nonimpeachment exhibit through that witness, they will give us a list at the same time so we can both raise any evidentiary objections in advance of the witness's testimony. Again, I think especially in as much Mr. Schwartz represented on Wednesday that he intended to introduce his exhibits or at least some of his exhibits through the government witnesses, we think the reciprocity there would save everyone's time and be beneficial.

I also think rather than doing it on a Friday when the witness may not be on the stand for another week, it would allow for both parties to exchange more tailored narrow lists. We have had already in this case production of, as your Honor was aware, three million pages of Rule 16 material because Mr. Schwartz couldn't figure out what he might use in his case-in-chief.

THE COURT: Let's focus on the question at hand.

MR. QUIGLEY: Again, I think that is appropriate. In

the Silver trial, they did it the night before. This is even a little bit further --

THE COURT: Meaning the defendants did?

MR. QUIGLEY: Both sides did. The parties at the end of the trial day, the parties exchanged their exhibit list for the next day and then within a matter of hours raised to the Court any objections. I am proposing to do it a day sooner even.

THE COURT: What are your all your thoughts?

I am going to remind everyone it is very difficult to hear, so please all use the minings.

MS. NOTARI: The government's arguments are premised on the argument that we're working on equal footing. They have the burden of proof here. They are required to put on their evidence and without a view towards the defendants' theory of the case. Quite frankly the elements on cross-examination and getting to the truth is the reaction of witnesses to questions that are asked. They should not be given the opportunity to preview with their witnesses the documents that we intend to reference because there goes the spontaneity. If a witness gets to preempt what exhibits we're going to go through, that is not what trials are about. It is not what cross-examination is.

So they have the burden of proof, they are putting on their case and those rules do not apply to us. I have never

been in a trial where we have to give our exhibits so far in advance. We've already accommodated that. So they have some understanding of what our case is, but I think this goes beyond what trials are about.

MR. QUIGLEY: I am talking about nonimpeachment exhibits. Obviously if they want to introduce exhibits in their case-in-chief through our witnesses, affirmatively introduce exhibits into evidence, it is in everyone's interest to streamline any evidentiary issues beforehand. I don't think there will be a ton of surprises in terms of the contents of the exhibits here. They have had our exhibits for, I think, since March 15. We have had their exhibits since April 23rd. There obviously has been some rolling production on both sides. Mr. Touger hasn't produced any exhibits yet.

MR. TOUGER: I--

THE COURT: Don't interrupt, please.

MR. QUIGLEY: I think that it is everyone's interest given the volume of exhibits for stuff that both sides are intending to introducing affirmatively to raise any evidentiary objections in advance.

MR. TOUGER: For the government to say that they gave us all their evidence a month and a half is quite frankly ridiculous. Just this morning we got another chunk of information. Thousands of documents have come over since they said they were complete. I don't understand why. Some of them

they obviously had for a long time.

THE COURT: Let's focus right now on when to turn them over.

MR. TOUGER: Sorry. I don't have any documents in my possession now that they don't have in their possession now.

THE COURT: That's not the question.

MR. TOUGER: Let me finish.

The other idea is if they want a list from me before I cross-examine a witness about what documents I am going to use at cross, it is probably the same documents that they are going to use on direct. Frankly, I don't want to spend my time getting through documents that they are going to give me.

THE COURT: Look, if you don't know which documents you are going to use -- not for purposes of impeachment -- with respect to a witness, that is a different issue.

MR. TOUGER: It is not a question of not knowing. There are thousands of documents listed under different tabs, different numbers, different places and it would take literally hours to get to the point and then print those out.

THE COURT: No one is asking you to print them.

MR. TOUGER: Same thing. To forward them.

THE COURT: No. To identify for them if you are willing to. You have the documents they are going to use.

MR. TOUGER: They have taken the documents that they are going to use Dunkerley. They know exactly what documents

they are going to use. They cross-examined Dunkerley at least five times. They know what documents they are going to use. If they give me those documents, I will be happy to say, I am going to add these two documents to that list.

THE COURT: I don't think it is any time beyond what you are going to do. Whether you don't want to disclose your strategy, I understand that concern. It doesn't add any additional time.

MR. TOUGER: The entrusted denture in this case, I would give them that document. They are going to give it to me. Why should we spend the time doing that if they are going to give it to me?

THE COURT: Let me ask a question. If the government were to identify for each particular witness which exhibits it intended to utilize two days in advance, would the defendants be willing one day in advance to advise the government which exhibits for those witnesses they intend to utilize and not for impeachment? You can tell me yes or no.

Your answer, Mr. Touger?

MR. TOUGER: Yes.

MR. SCHWARTZ: No, your Honor, and I am happy to explain why.

THE COURT: Sure.

MR. SCHWARTZ: A few things. First, in my experience in this case, we're not going have an agreement with the

government about what constitutes impeachment evidence versus direct evidence. We massively overdisclosed in advance to the point where they have complained about our overdisclosure precisely because we didn't want to be in a position where there was a disagreement about whether something had be properly disclosed and so they were seeking to exclude evidence because they made clear that is what they were going to do.

For cross-examination of their witnesses, however, most of what we have already produced to the government is impeachment evidence, and I don't want to tell them with respect to specific witnesses specifically which documents I am going to use to impeach. We're not going to see eye to eye on that.

I also separately don't want the government co-opting my cross strategy by taking the exhibits that I was going to use in cross and adding them to their direct so that suddenly what I was going to do is pulling a sting on the same affirmative evidence. With respect, I am not willing to do that. What I am willing to do is if the government provides advance notice of their exhibits -- and my experience in complex white-collared cases in this district has been what Ms. Notari said, which is that we get notice Friday the week before of anticipated exhibits. Again, understanding as Mr. Quigley said they will be refinements and additions and subtractions. What I am willing to do if we get advanced notice is go through

those in advance and tell the government exactly what I object to and what I don't. We can tee up for your Honor what is subject to objection. The rest they can move into evidence at the very beginning of their direct without objection. That is what makes trials go more quickly. I submit that is part of the reason why Silver, where I represented a witness, went so quickly in addition to the fact it was a retrial.

THE COURT: I was going to to say that.

MR. SCHWARTZ: It is fundamentally different.

THE COURT: Go ahead.

MR. QUIGLEY: Your Honor, I disagree. I think the whole purpose of this premarking, preexchange of exhibits or pregiving of the exhibits is to make the trial go more smoothly. We have complied with our discovery obligations, our Rule 16 obligations and our obligations to produce exhibits. We have produced exhibits timely in advance of trial. So if the purpose is to make the trial go more smoothly, then there should be reciprocity in terms of what we're exchanging.

I would add that there are not a lot of secrets in terms of what exhibits our witnesses are going to be shown because the exhibits were marked so early witnesses. The witnesses were shown GX whatever.

THE COURT: Do you have examples of other white-collared cases aside from the Silver retrial in which defendants produced their exhibits per witness in advance?

MR. QUIGLEY: I could ask around, your Honor, but that is the one I am most familiar with.

THE COURT: I do think it is different given that there was a retrial in terms of strategy and defenses and so why don't you let me know that and I will let you know by the end of the day.

MR. QUIGLEY: Thank you, your Honor.

THE COURT: The jury is on its way.

(Continued on next page)

(At the side bar)

MS. MERMELSTEIN: Your Honor, I noticed over the weekend a number of associates and their names are not on the --

THE COURT: I am glad you brought that that up. When I mention your name, if you can mention the other people from your firm.

MR. SCHWARTZ: Do you want me to do that or me to provide the names. I think there will be three other names.

THE COURT: You can do it right now.

MR. SCHWARTZ: Why don't I tell you that way it is coming from your Honor.

MR. SCHWARTZ: Laura Harris, Craig Wenner, Kendall Jackson.

THE COURT: Mr. Touger, you don't have anyone else working with you?

MR. TOUGER: No, it is just me.

MS. MERMELSTEIN: There are two other FBI agents who will not be at counsel table but will be in the courtroom. I defer to whatever your Honor wants. They participated in various wire taps so it is conceivable. Nick Krall, K-r-a-l-l, and E-c-k-e-l.

THE COURT: Thank you.

(Jury voir dire)

(Adjourned to May 23, 2018 at 9:00 a.m.)